473 F.2d 790
 Paul B. BRONKEN, Plaintiff-Appellant,
v.
Rogers C. B. MORTON, Secretary of the Interior, Defendant-Appellee.
Dessie M. HALL and First National Bank of Nevada,
Plaintiffs-Appellants,
v.
Rogers C. B. MORTON, Secretary of the Interior, Defendant-Appellant.
Ferris F. BOOTHE, Plaintiff-Appellant,
v.
Rogers C. B. MORTON, Secretary of the Interior, et al.,
Defendants-Appellees.
 Nos. 25282-25284.
 United States Court of Appeals,
Ninth Circuit.
 Jan. 3, 1973.
Rehearing Denied March 29, 1973.
 
 Ferris F. Boothe (argued), of Black, Kendall, Tremaine, Boothe & Higgins, Portland, Ore., Bradley & Drendel, Reno, Nev., for plaintiffs-appellants.
 Jacques B. Gelin, Atty. (argued), Raymond N. Zagone, Atty., Shiro Kashiwa, Asst. Atty. Gen., Washington, D. C., Bart M. Schouweiller, U. S. Atty., Reno, Nev., for defendants-appellees.
 Before KOELSCH and CHOY, Circuit Judges, and POWELL,* District Judge.
 KOELSCH, Circuit Judge:
 
 
 1
 These three cases are here on the plaintiffs' appeals from summary judgments dismissing their actions to review administrative decisions of the Secretary of the Interior refusing to issue patents to public lands pursuant to applications filed by plaintiffs as holders of land selection rights.[1]
 
 
 2
 From time to time, especially during the Nineteenth Century, Congress has seen fit to bestow upon persons performing services for the government, or upon other persons deemed worthy, rights to receive lands from the public domain. To that end, provisions have been made for the issuance of "scrip" or other evidence of such rights, which would entitle the holders to land patents upon presentation of the rights to the Secretary of the Interior or his designates.[2] In the early days of scrip, the land selection process was quite simple. A scrip holder merely presented his rights and designated any unreserved lands he wished to acquire. However, a series of executive orders withdrew from selection or reserved virtually all public lands.[3] And the Taylor Grazing Act of 1934 was enacted. Under Section 7 of that Act (43 U.S.C. Sec. 315f), the Secretary of the Interior was authorized, in his discretion, to "examine and classify any [public] lands withdrawn or reserved by [executive orders] . . . which are more valuable or suitable for the production of agricultural crops than for the production of native grasses and forage plants, or more valuable or suitable for any other use than for the use provided for under this Act, or proper for acquisition in satisfaction of any outstanding lieu (sic), exchange or script (sic) rights or land grant, and to open such lands to entry, selection, or location for disposal in accordance with such classification under applicable public land laws * * *."
 
 
 3
 After the Taylor Grazing Act, scrip holders were required, before they could redeem their rights, to apply to the Secretary to have the lands they wished to enter "classified" for scrip redemption purposes. Thus, the Secretary, by exercising his classification authority, could prevent the transfer to scrip holders or other claimants of lands which he deemed should be retained in federal ownership or used for some other public purpose, thereby effectuating the "national policy of conservation of the rapidly diminishing public domain and its natural resources." See Carl v. Udall, 114 U.S.App. D.C. 33, 309 F.2d 653, 657-658 (1962).
 
 
 4
 However, neither executive withdrawal nor the Taylor Grazing Act directly affected land selection rights, except to the extent the Secretary's classification authority limited their exercise. Most of these rights were of unlimited duration and, apparently, no accurate record had ever been maintained as to the amount of scrip which had been redeemed or which remained outstanding as inchoate claims on the public domain. To resolve this problem, Congress passed the Act of August 5, 1955 (69 Stat. 534), which provided in substance that all holders of scrip and similar selection rights were obliged to record their claims with the Department of the Interior within two years, and that claims not so recorded would not thereafter be honored. Then, on August 31, 1964, Congress placed a time limitation upon the validity of all the scrip claims recorded under the 1955 Act. By the 1964 Act (78 Stat. 751), Congress required all valid claims to be presented, either for land or for money, by January 1, 1970, or January 1, 1975, depending upon the type of claim; failure to present the claims in one of the methods provided by the Act would render the claims "null and void."
 
 
 5
 In addition, the 1964 Act, in terms, distinguished between scrip applications filed before July 1, 1966, and those filed thereafter. Thus, with respect to those applications filed before July 1, 1966, Section 2 of the Act permitted the applicant to designate lands of his own selection, and directed that the Secretary's classification decision was to be made "under existing law."[4] However, with respect to applications made after July 1, 1966, the terms of Section 3 provided, in effect, that the applicant no longer enjoyed an option to select such lands as he desired, but was limited to making a selection from a reservoir of public lands which the Secretary was to classify and set aside for conveyance and exchange for these applications.[5] To protect the rights of these latter applicants, Congress provided that the public lands to be placed in this reservoir, or pool, for selection, have a value of not less than the average value of lands conveyed by patent for each type of scrip claim since the passage of the 1955 Act.
 
 
 6
 In August of 1966, the Secretary promulgated a regulation [43 C.F.R. Sec. 2221.07 (1967)], under which he established guidelines to implement the land classification provisions of the 1964 Act. The regulation provided that, when lands are classified to form the selection pool pursuant to Section 3 of the 1964 Act, only those lands having certain values will be available for each type of scrip claim. The minimum values were set, in accordance with the provisions of the Act, at the average value of lands conveyed for each type of claim since August 1955. 43 C.F.R. Sec. 2221.07(e). The regulation also provided, however, that "no tract of land will be classified as suitable for disposition in satisfaction for claims" if the value per acre of the lands was more than ten percent greater than these minimum value figures. 43 C.F.R. Sec. 2221.07(f) (1967). Thus, the Secretary not only set a floor but, in addition, fixed a ceiling on the value of lands eligible for selection.
 
 
 7
 These cases involve several aspects of the Secretary's powers in handling applications for public lands under the 1964 Act. The Bronken and Hall appeals bring into question the Secretary's power to apply the value limitation of 43 C.F.R. Sec. 2221.07(f) to lands applied for prior to July 1, 1966. Boothe's appeal questions the authority of the Secretary to impose land use criteria to pre-1966 applications, and the validity of his regulation establishing maximum values for lands to be classified for conveyance pursuant to Section 3 of the 1964 Act.
 
 
 8
 I. THE BRONKEN-HALL APPEALS.
 
 
 9
 Bronken and Hall, as holders of Valentine scrip, filed application for public lands located near Las Vegas, Nevada, in April and June of 1964, and in February of 1965. Since the applications were filed prior to July 1, 1966, the Secretary was obliged, by Section 2 of the 1964 Act, to treat the applications under "existing law." The Secretary took no action on the applications until early 1967, at which time he rejected the applications for the following reason:
 
 
 10
 "Based upon analysis of sales of similar land located nearby, the estimate of value of the parcel[s] far exceeds the maximum value established by regulation [43 C.F.R. 2221.07(f)] for land to be classified for disposal in satisfaction of Valentine Scrip * * *."
 
 
 11
 In the District Court, Bronken and Hall asserted that the Secretary's application of the regulation was contrary to the provisions of Section 2 of the 1964 Act. The court, however, did not reach this question, being of the opinion that the Secretary had acted within his discretion under the public land laws and that, therefore, judicial review was precluded by Section 10 of the Administrative Procedure Act. 5 U.S.C. Sec. 701. Hall v. Hickel, 305 F.Supp. 723 (D.Nev.1969). We reverse.
 
 
 12
 "We recognize the intrinsic difficulty in determining whether a discretionary action of an agency is reviewable. Almost every agency action involves some degree of discretion of judgment. Yet it cannot be said that, for this reason, every agency action is unreviewable [citation omitted]. The analytical problem is that of determining when the agency action is 'committed to agency discretion' within the meaning of section 10 of the Administrative Procedure Act, and when it merely 'involves' discretion which is nevertheless reviewable." Ferry v. Udall, 336 F.2d 706, 711 (9th Cir. 1964), cert. denied, 381 U.S. 904, 85 S.Ct. 1449, 14 L.Ed.2d 286. While it is true, as the District Court observed, that the Secretary's discretion in classifying public lands is quite broad, it is equally true that this discretion is not absolute. His decisions are beyond judicial scrutiny only when he possesses discretion, and he acts within the limits Congress has placed on this discretion.
 
 
 13
 In our view, Section 2 of the 1964 Act imposed a crucial limitation upon the Secretary's discretion in handling land scrip applications. That section provides that, upon an application filed prior to July 1, 1966, the Secretary "shall thereafter convey" the lands selected by the scrip applicant, so long as the land may be classified for such conveyance "under existing law." The clear meaning of this provision is that the Secretary was required to apply only those criteria to a Section 2 application which he historically applied prior to the passage of the 1964 Act. We are clear that monetary value of the selected lands was not one of those criteria. In recommending enactment of the 1964 Act, the Assistant Secretary wrote the Congress that "Under existing law, scrip holders may acquire any unreserved public lands to the extent that the acreage of the scrip permits. Such selections require favorable consideration under Section 7 of the Taylor Grazing Act, 43 U.S.C. Sec. 315f." H. Rep. No. 1248, 88th Cong. 2d Sess. (1964), at 4-5. Congress placed no value limitation on the lands which might be selected under Section 2. Notwithstanding the clear provisions of Section 2 and the state of existing law at the time of the Act's passage, the Secretary refused to process applications for land he deemed too expensive.[6] Instead, Department officials attempted to obtain an amendment to the Act which by its terms would impose maximum dollar values on all lands available to scrip holders.[7] The amendment died in committee, and it is apparent from hearings on the amendment, held in both the Senate and House committees, that in 1965 neither the committee members nor the Secretary were of the opinion that Section 2 authorized placing value limits on lands available for selection by scrip holders.[8] Moreover, the Secretary's treatment of these scrip applications is completely at variance with assurances given the committee members by the Assistant Secretary that scrip applications filed before July 1966, would be handled without reference to the value of the lands selected by the applicants.[9]
 
 
 14
 In view of the legislative history of the 1964 Act, and of the proposed amendment to that Act, we think it clear that the Secretary was without authority to impose value limits upon Section 2, applicant-selected, lands. He had no authority to place such limits on lands under the law as it existed in 1964, and the Act did not grant him any additional authority to do so.[10] Consequently, the Secretary's denial of the Bronken and Hall applications, solely by reason of their high value, was erroneous.[11]
 
 
 15
 II. THE BOOTHE APPEAL.
 
 
 16
 Boothe, a holder of Soldiers' Additional Homestead Rights, filed two applications for public lands.
 
 
 17
 (1) The Carson City Claim.
 
 
 18
 The first claim, filed July 1965, designated approximately 200 acres of land near Carson City, Nevada. The Secretary refused to classify the lands for conveyance because:
 
 
 19
 "(A) The subject lands are not truly agricultural in character as they are not economically reclaimable for agricultural use;
 
 
 20
 (B) The lands are valuable for higher uses than agriculture."[12]
 
 
 21
 Boothe's attack is focused upon the Secretary's application of an agricultural suitability criterion on lands available for selection by holders of Soldiers' Additional Rights. He contends that such a limitation is contrary to the provision of the Act which created those rights and that, therefore, the Secretary's stated grounds for denying his application were invalid. We disagree.
 
 
 22
 The Act authorizing the creation of Soldiers' Additional Rights, now 43 U.S.C. Sec. 274, provides:
 
 
 23
 "Every person entitled, under the provisions of section 271 of this title to enter a homestead who may have, prior to June 22, 1874, entered, under the homestead laws, a quantity of land less than one hundred and sixty acres, shall be permitted to enter so much land as, when added to the quantity previously entered, shall not exceed one hundred and sixty acres."
 
 
 24
 While it is true, as Boothe points out, that this statute does not expressly limit the exercise of Soldiers' Additional Rights to agricultural lands, the Department of the Interior has for many years interpreted the Section to mean that only those lands which might be entered under 43 U.S.C. Sec. 271 as an original homestead may be made the subject of an additional entry under Section 274. "The purpose of the latter Section was to enable a Civil War veteran who had already entered a homestead, but who had taken up less than 160 acres, to expand his entry up to a maximum of 160 acres on the same basis as that on which other veterans might make original homestead entries under [Section 271]." David B. Morgan, 60 I.D. 266, 269 (1948). This meant, in the Department's view, that only land which is "subject to entry under the homestead laws of the United States" is subject to entry by a holder of Soldiers' Additional Rights.
 
 
 25
 "The practical construction given to an act of Congress, fairly susceptible of different constructions, by those charged with the duty of executing it is entitled to great respect and, if acted upon for a number of years will not be disturbed except for cogent reasons."
 
 
 26
 McLaren v. Fleischer, 256 U.S. 477, 481, 41 S.Ct. 577, 578, 65 L.Ed. 1052 (1921); Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1065); Webster v. Luther, 163 U.S. 331, 16 S.Ct. 963, 41 L.Ed. 179 (1896). Boothe relies heavily on Webster v. Luther, in which the Supreme Court held that the Department could not construe the Soldiers' Additional Rights Statute to preclude assignment of the rights, as such a construction would "defeat the obvious purpose" of the Statute, 163 U.S. at 342, 16 S.Ct. 963, which was, "to give [the right] as a sort of compensation for the person's failure to get the full quota of 160 acres by his first homestead entry." 163 U.S. at 340, 16 S.Ct. at 966. Although the Webster opinion might be read to suggest that the right is unlimited, the Court had before it only the issue of assignability of the rights, and we are not persuaded that the decision foreclosed the interpretation of the statute adopted by the Secretary on his Morgan decision, and consistently applied thereafter. The statute was enacted as part of an Act which created both a general homestead right for Civil War veterans and the "additional" right involved here. The Court reasoned in Webster that construing the right as non-assignable would render the right worthless, and that Congress could not have intended such a result. However, a construction which limits the exchange of the right to lands suitable for agriculture would not occasion such a result but, rather, would put the holder of the additional right on the same footing as those veterans who had obtained their entire 160 acre entitlement by an original homestead entry. The Department has approached the statute on these grounds, and we cannot say that its interpretation is an "unreasonable" one. Udall v. Tallman, 380 U.S. 1, 18, 85 S.Ct. 792, 13 L.Ed. 2d 616 (1965). We are therefore constrained to follow the Secretary's interpretation.
 
 
 27
 Because the Secretary applied a correct legal standard to Boothe's Carson City application, and because such a standard was a part of "existing law" within the meaning of Section 2 of the 1964 Act, we are "without power" to review the Secretary's decision any further, as it is clear that he acted in an area committed by law to his discretion. See Ferry v. Udall, 336 F.2d 706, 711 (9th Cir. 1964), cert. denied, 381 U.S. 904, 85 S.Ct. 1449, 14 L.Ed.2d 286.
 
 
 28
 (2) The Las Vegas Application.
 
 
 29
 Boothe's second application was made after July 1, 1966. Accordingly, his selection rights are governed by the provisions of Section 3 of the 1964 Act. The Secretary denied Boothe's Las Vegas application because the lands had not been previously classified as available for selection in satisfaction of Soldiers' Additional Rights. The District Court upheld the regulation under which the Secretary had classified lands pursuant to Section 3 [43 C.F.R. Sec. 2221.07 (1967)] and dismissed Boothe's action to review the Secretary's decision. Boothe v. Hickel, supra.
 
 
 30
 Under Section 3, the Secretary is required to set aside, "for conveyance and exchange for each type of claim recorded under the [1955 Recording Act], public lands in sufficient quantity so as to provide each holder of such a claim with a reasonable choice of public lands against which to satisfy his claim * * *." So long as the Secretary complied with the Act's requirements in classifying a selection pool of lands for the satisfaction of "each type" of claim, a scrip holder could acquire, under Section 3, only those lands "so classified." The sole limits Congress placed on the Secretary's discretion to classify lands for these pools were that he offer a "reasonable selection" of lands, and that the lands so classified have a value of "not less than the average fair market value . . . of those public lands actually conveyed in exchange for each type of claim since August 5, 1955."
 
 
 31
 The Secretary established his scrip selection pool, consisting of approximately three times the acreage represented by outstanding scrip claims, and, pursuant to 43 C.F.R. 2221.07(a) (1967), specified in his classification orders the types of scrip claims for which each tract would be available. Pursuant to subsections (e) and (f) of 43 C.F.R. Sec. 2221.07, the lands available for each type of claim ranged in value from a minimum amount, as provided by Section 3 of the Act, to a maximum of ten percent above this minimum.
 
 
 32
 We agree with the District Court that the Secretary's actions in carrying out the provisions of Section 3 were proper, and satisfied the statutory requirements. Boothe's attack on the value ceilings imposed by the Secretary in establishing his selection pools fails to recognize the essential difference between the Secretary's authority to handle claims under Section 2 of the Act, where the applicant could designate the lands, and under Section 3, which removed the applicant's right to initially select the particular land he desired. Under the latter section, the scrip holder could take only what was made available by the Secretary for his claim. As the Act itself required only that the lands have a specified minimum value, no scrip holder could complain if the lands classified as suitable for exchange for his scrip exceeded this minimum. The effect of the regulation setting value ceilings on lands available for each type of claim was merely to make all the lands in a given selection pool of approximately equal value.[13] We cannot say that the Secretary's scheme of classification was inconsistent with the purposes of Section 3,[14] or that it was unreasonable. Thus, Boothe had no right under Section 3 to seek lands other than those previously classified as available to holders of Solidiers' Additional Rights. The lands he applied for were not so classified. Accordingly, the Secretary's denial of his application was correct.
 
 
 33
 The judgments in the Bronken and Hall appeals (Nos. 25,282 and 25,283) are reversed, with directions to remand the action to the Secretary of the Interior for further proceedings in conformity with this opinion.
 
 
 34
 The judgment in the Boothe appeal (No. 25,284) is affirmed.
 
 
 
 *
 Honorable Charles L. Powell, United States District Judge, Spokane, Washington, sitting by designation
 
 
 [1]
 The applications of Bronken and Hall (Nos. 25,282 and 25,283) were based upon Valentine Special Certificates, scrip rights created by the Act of April 5, 1872 (17 Stat. 649), to compensate one Valentine, successor to a Mexican land grant, for the loss of some 13,000 acres to settlers claiming title derived from the United States. The Act gave the claimant the right to select ". . . an equal quantity of the unoccupied and unappropriated public lands of the United States, not mineral * * *."
 Boothe's applications were based upon Soldiers' Additional Homestead Rights, created by the Act of June 8, 1872. That act, as amended, appears in 43 U.S.C. Sec. 274, and will be discussed in Part II of this opinion.
 
 
 [2]
 See, e. g., Act of April 5, 1872, 17 Stat. 649 (Valentine scrip); Act of July 17, 1854, 10 Stat. 304 (Sioux Half-Breed scrip); Acts of June 22, 1860, 12 Stat. 85, March 2, 1867, 14 Stat. 544, and June 10, 1872 (Supreme Court scrip); Act of June 2, 1858, 11 Stat. 294 (Surveyor-General scrip); Act of February 10, 1855, 10 Stat. 849 (Girard Special Certificates); Act of April 11, 1860, 12 Stat. 836 (Porterfield warrants); Treaty of March 17, 1842, 11 Stat. 581 (Wyandotte scrip); Act of March 3, 1905, 33 Stat. 1264 (forest lieu selection rights)
 
 
 [3]
 Executive Orders, No. 6910 (1934); No. 6964 (1935) and No. 7048 (1935)
 
 
 [4]
 Section 2 provides:
 "Prior to July 1, 1966, holders of claims recorded under the [1955 Act] may apply to the Secretary of the Interior to have conveyed to them, in satisfaction of their claims, such lands as they may, in their applications, designate. The Secretary shall thereafter convey the selected lands if he finds them to be proper, under existing law, for such disposition, and if the claim upon which an application is based is determined to be valid."
 
 
 [5]
 Section 3 provides:
 "(a) Prior to January 1, 1967, the Secretary shall classify, for conveyance and exchange for each type of claim recorded under the [1955 Act], public lands in sufficient quantity so as to provide each holder of such a claim with a reasonable choice of public lands against which to satisfy his claim. The public lands so classified shall be of a value of not less than the average fair market value, determined by the Secretary as of the date patent issued, of those public lands actually conveyed in exchange for each type of claim since August 5, 1955.
 (b) Holders of recorded claims may apply for reasonably compact areas of land so classified and, upon his determination that the claim upon which an application is based is valid, the Secretary shall convey such lands to the applicant."
 
 
 [6]
 As indicated earlier, two of the three applications involved in the Bronken-Hall appeal were filed even prior to the enactment of the 1964 Act, and the remaining application was filed shortly after its enactment
 
 
 [7]
 S.2321, H.R. 10,193, 89th Cong
 
 
 [8]
 See, Hearings on S.2321, before the Senate Subcommittee on Public Lands, Comm. on Interior and Insular Affairs, 89th Cong. 1st Sess. (Aug. 19, 1965), at 8; Hearings on H.R. 10,193, Before the House Subcommittee on Public Lands, Comm. on Interior and Insular Affairs, 89th Cong. (Aug. 20, 1965, and Feb. 10, 1966), at 9-10
 
 
 [9]
 In the House hearings, Mr. Carver, the Assistant Secretary, assured the subcommittee chairman that he would end his "moratorium" on pending applications, and that, "Everybody else will be handled in the manner which I told the committee today; namely, they can apply without limitation of value before 1966." House Hearings, supra note 8, at 105
 
 
 [10]
 The Department files on the Hall application show that in 1964, shortly before the Act was passed, the Secretary issued patent to other lands in the Las Vegas area having a value approximately equal to the value of the lands involved in the Bronken and Hall applications. During the Hall administrative protest proceeding, this fact was admitted and brushed aside with the statement that "The classification and disposal [of those other parcels] was in accordance with regulations then in effect." What this meant was that there was nothing in the regulations at that time prohibiting classification of applicant-selected lands on the basis of monetary value alone. The Department's position in the Bronken-Hall matters has been, in effect, that by sitting on these applications until after the promulgation of the 1966 regulations, it could apply the standards embodied in those regulations to applications filed under Section 2 of the Act. This is simply contrary to the express provisions of Section 2. The date an application was made, not the date the Secretary eventually decided to process the application, is the controlling date in determining the standards to be imposed on a particular scrip application. As these applications all predated July, 1966 (two of the three applications involved herein predated the 1964 Act itself), the Secretary was, by the terms of Section 2, expressly precluded from imposing new criteria on applicant-selected lands
 
 
 [11]
 We do not hold that scrip applicants are entitled to a patent on particular public lands merely by making a designation of the lands they desire. See Carl v. Udall, 114 U.S.App.D.C. 33, 309 F.2d 653 (1962). In the ordinary case, the Secretary may deny an application for a variety of reasons, applying land use considerations, or by determining that certain parcels should be retained in federal ownership or used for some other public purpose. On these "nice issues of judgment and choice," [Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 317, 78 S.Ct. 752, 757, 2 L.Ed.2d 788 (1958)], the Secretary retains broad discretion, and his determinations are not subject to judicial review. See Hi-Ridge Lumber Co. v. United States, 443 F.2d 452 (9th Cir. 1971). However, from this record it appears that, aside from the value of the lands, the Secretary suggested no other reason why these lands should not be conveyed to the scrip holder applicants. In fact, the Bureau of Land Management Field Examiner's reports all concluded that the lands "are suitable for transfer out of federal ownership inasmuch as they are not needed in any Bureau or other Federal programs. . . ." Thus, there appears no reason why appellants Bronken and Hall are not entitled, by reason of Section 2, to have these lands conveyed to them
 
 
 [12]
 The District Court declined to review the Secretary's decision on this application on the same ground relied upon in the Bronken-Hall petition, i. e., that the Secretary had acted within his discretion to classify public lands. Boothe v. Hickel, 347 F.Supp. 1273 (D.Nev.1969). In this instance, we conclude that the decision was correct
 
 
 [13]
 Moreover, since under Section 6 of the Act scrip holders could accept cash rather than land for their scrip, and the amount of the cash payment was set at the average values of lands available for each type of claim, the Secretary's scheme put all claimants in an approximately equal position, whether they elected to accept lands or cash in exchange for their selection rights
 
 
 [14]
 The Department's plan to carry out the provisions of Section 3 in this manner was explained to the Senate committee when it considered the 1964 Act. In a statement to the committee, the Assistant Secretary said: "It is our intent, if the bill is passed in the House-passed form, to offer scrip holders land ranging in value from the average fair market value as prescribed in Section 3(a) to approximately 10 percent above that average value." Hearings on H.R. 4149, Before the Senate Subcommittee on Public Lands, Comm. on Interior and Insular Affairs, 88th Cong., 2d Sess. (Aug. 11, 1964), at 9