# ANDRUS, SECRETARY OF THE INTERIOR *v.* UTAH

No. 78–1522.   Argued December 5, 1979—Decided May 19, 1980

STEVENS, J., delivered the opinion of the Court, in which BRENNAN, STEWART, WHITE, and MARSHALL, JJ., joined. POWELL, J., filed a dis-

senting opinion, in which BURGER, C. J., and BLACKMUN and REHNQUIST, JJ., joined, *post,* p. 520.

*Peter Buscemi* argued the cause *pro hac vice* for petitioner. With him on the briefs were *Solicitor General McCree, Assistant Attorney General Moorman, Deputy Solicitor General Claiborne,* and *Carl Strass.*

*Richard L. Dewsnup,* Assistant Attorney General of Utah, argued the cause for respondent. With him on the brief were *Robert B. Hansen,* Attorney General, and *Dallin W. Jensen, Michael M. Quealy,* and *Paul E. Reimann,* Assistant Attorneys General.*

MR. JUSTICE STEVENS delivered the opinion of the Court.

The State of Utah claims the right to select extremely valuable oil shale lands located within federal grazing districts in lieu of and as indemnification for original school land grants of significantly lesser value that were frustrated by federal pre-emption, or private entry, prior to survey. The question presented is whether the Secretary of the Interior is obliged to accept Utah's selections of substitute tracts of the

---

*Briefs of *amici curiae* urging affirmance were filed by *George Deukmejian,* Attorney General of California, *N. Gregory Taylor* and *Jan S. Stevens,* Assistant Attorneys General, and *Stephen H. Mills,* Deputy Attorney General, *Robert K. Corbin,* Attorney General of Arizona, *J. D. MacFarlane,* Attorney General of Colorado, *John F. North,* Special Assistant Attorney General of Montana, *Richard H. Bryan,* Attorney General of Nevada, *Jeff Bingaman,* Attorney General of New Mexico, and *William O. Jordan,* Special Assistant Attorney General, *James A. Redden,* Attorney General of Oregon, and *Peter S. Herman, Slade Gorton,* Attorney General of Washington, and *Theodore O. Torve* and *J. Lawrence Coniff, Jr.,* Assistant Attorneys General, and *John D. Troughton,* Attorney General of Wyoming, for the State of California et al.; and by *David H. Leroy,* Attorney General of Idaho, and *W. Hugh O'Riordan,* Deputy Attorney General, for the State of Idaho.

Briefs of *amici curiae* were filed by *Richard C. Cahoon* for Justheim Petroleum Co.; and by *Stephen G. Boyden* and *Scott C. Pugsley* for the Ute Indian Tribe of the Uintah and Ouray Reservation.

same size as the originally designated sections even though there is a gross disparity between the value of the original grants and the selected substitutes. We hold that the Secretary's "grossly disparate value" policy is a lawful exercise of the broad discretion vested in him by § 7 of the Taylor Grazing Act of 1934, 48 Stat. 1272, as amended in 1936, 49 Stat. 1976, 43 U. S. C. § 315f, and is a valid ground for refusing to accept Utah's selections.

Utah became a State in 1896. In the Utah Enabling Act of 1894, Congress granted Utah, upon admission, four numbered sections in each township for the support of public schools. The statute provided that if the designated sections had already "been sold or otherwise disposed of" pursuant to another Act of Congress, "other lands equivalent thereto . . . are hereby granted." The substitute grants, denominated "indemnity lands" were "to be selected within the State in such manner as [its] legislature may provide with the approval of the Secretary of the Interior." [1]

Because much of the State was not surveyed until long after its admission to the Union, its indemnity or "in lieu" selections were not made promptly. On September 10, 1965,

---

[1] "That upon the admission of said State [Utah] into the Union, sections numbered two, sixteen, thirty-two, and thirty-six in every township of said proposed State, and where such sections or any parts thereof have been sold or otherwise disposed of by or under the authority of any Act of Congress other *lands equivalent thereto,* in legal subdivisions of not less than one quarter section and as contiguous as may be to the section in lieu of which the same is taken, are hereby granted to said State for the support of common schools, such *indemnity lands* to be selected within said State in such manner as the legislature may provide, with the approval of the Secretary of the Interior: *Provided,* That the second, sixteenth, thirty-second, and thirty-sixth sections embraced in permanent reservations for national purposes shall not, at any time, be subject to the grants nor to the indemnity provisions of this Act, nor shall any lands embraced in Indian, military, or other reservations of any character be subject to the grants or to the indemnity provisions of this Act until the reservation shall have been extinguished and such lands be restored to and become a part of the public domain." 28 Stat. 109 (emphasis added).

Utah filed the first of 194 selection lists with the Bureau of Land Management of the Department of the Interior covering the land in dispute in this litigation. The 194 indemnity selections include 157,255.90 acres in Uintah County, Utah, all of which are located within federal grazing districts created pursuant to the Taylor Grazing Act.

In January 1974, before Utah's selection lists had been approved or disapproved, the Governor of Utah agreed that the Secretary of the Interior could include two tracts comprising 10,240 acres of selected indemnity lands in an oil shale leasing program, on the understanding that the rental proceeds would ultimately be paid to the State if its selections were approved. The proceeds of the leases are of substantial value.[2]

In February 1974, the Secretary advised the Governor that he would not approve any indemnity applications that involved "grossly disparate values."[3] He wrote:

"As you know, the Department of the Interior has not as yet acted upon the State's [indemnity] applications. The principal question presented by the applications is whether pursuant to Section 7 of the Taylor Grazing Act, 48 Stat. 1272 (1934), as amended, 43 U. S. C. § 315f (1972), the Department may refuse to convey applied-for lands to a State where the value of those lands greatly exceeds the value of the lost school lands for which the State seeks indemnity. In January 1967, the then Secre-

---

[2] The District Court found that as of May 25, 1976, $48,291,840 had been accumulated. App. to Pet. for Cert. 62a. It should be noted that these proceeds were derived from only 10,240 acres out of the total area selected comprising over 157,000 acres.

[3] Suggested guidelines of the Department of the Interior provide that the policy will not be applied unless the estimated value of the selected lands exceeds that of the base lands by more than $100 per acre or 25% whichever is greater. If the values are grossly disparate using those criteria, the case will be submitted to the Washington office for evaluation of all the circumstances. App. 44–45.

tary of the Interior adopted the policy that in the exercise of his discretion under, *inter alia,* Section 7 of the Taylor Grazing Act, he would refuse to approve indemnity applications that involve grossly disparate values. That policy remains in effect.

"In the present case, although the land values are not precisely determined, it appears that the selections involve lands of grossly disparate values, within the meaning of the Department's policy. While the Department is not yet prepared to adjudicate the State's applications, I feel it is appropriate at this time to advise you that we will apply the above-mentioned policy in that adjudication." [4]

The State promptly filed this action in the United States District Court for the District of Utah. The facts were stipulated, and Judge Ritter entered summary judgment in favor of the State. He held that if Utah's selections satisfy all of the statutory criteria governing indemnity selections when filed,[5] the Secretary has no discretion to refuse them

---

[4] Letter of February 14, 1974, from Rogers Morton, Secretary of the Interior, to Calvin Rampton, Governor of the State of Utah. *Id.,* at 61.

[5] The statute provides, in part:

"§ 851. Deficiencies in grants to State by reason of settlements, etc., on designated sections generally

"Where settlements with a view to preemption or homestead have been, or shall hereafter be made, before the survey of the lands in the field, which are found to have been made on sections sixteen or thirty-six, those sections shall be subject to the claims of such settlers; and if such sections or either of them have been or shall be granted, reserved, or pledged for the use of schools or colleges in the State in which they lie, other lands of equal acreage are hereby appropriated and granted, and may be selected, in accordance with the provisions of section 852 of this title, by said State, in lieu of such as may be thus taken by preemption or homestead settlers. And other lands of equal acreage are also hereby appropriated and granted and may be selected, in accordance with the provisions of section 852 of this title, by said State where sections sixteen or thirty-six are, before title could pass to the State, included within any

pursuant to a "grossly disparate value" policy. The Court of Appeals for the Tenth Circuit affirmed, *Utah* v. *Kleppe,* 586 F. 2d 756 (1978), holding that § 7 of the Taylor Grazing

Indian, military, or other reservation, or are, before title could pass to the State, otherwise disposed of by the United States: *Provided,* That the selection of any lands under this section in lieu of sections granted or reserved to a State shall be a waiver by the State of its right to the granted or reserved sections. And other lands of equal acreage are also appropriated and granted, and may be selected, in accordance with the provisions of section 852 of this title, by said State to compensate deficiencies for school purposes, where sections sixteen or thirty-six are fractional in quantity, or where one or both are wanting by reason of the township being fractional, or from any natural cause whatever. And it shall be the duty of the Secretary of the Interior, without awaiting the extension of the public surveys, to ascertain and determine, by protraction or otherwise, the number of townships that will be included within such Indian, military, or other reservations, and thereupon the State shall be entitled to select indemnity lands to the extent of section for section in lieu of sections therein which have been or shall be granted, reserved, or pledged; but such selections may not be made within the boundaries of said reservation: *Provided, however,* That nothing in this section contained shall prevent any State from awaiting the extinguishment of any such military, Indian, or other reservation and the restoration of the lands therein embraced to the public domain and then taking the sections sixteen and thirty-six in place therein." 43 U. S. C. § 851.

"§ 852. Selections to supply deficiencies of school lands

"(a) Restrictions

"The lands appropriated by section 851 of this title shall be selected from any unappropriated, surveyed or unsurveyed public lands within the State where such losses or deficiencies occur subject to the following restrictions:

"(1) No lands mineral in character may be selected by a State except to the extent that the selection is being made as indemnity for mineral lands lost to the State because of appropriation before title could pass to the State;

"(2) No lands on a known geologic structure of a producing oil or gas field may be selected except to the extent that the selection is being made as indemnity for lands on such a structure lost to the State because of appropriation before title could pass to the State; and

"(3) Land subject to a mineral lease or permit may be selected if none of the land subject to that lease or permit is in a producing or producible

Act gave the Secretary no authority to classify land as eligible for selection and that the State had a right to select indemnity land of equal acreage without regard to the relative values of the original grants and the indemnity selections.

Because the dispute between the parties involves a significant issue regarding the disposition of vast amounts of public lands,[6] we granted certiorari. 442 U. S. 928. We believe that the Court of Appeals and the District Court failed to give proper effect to the congressional policy underlying the provision for indemnity selection, and specifically misconstrued § 7 of the Taylor Grazing Act as amended in 1936. We therefore reverse.

I

The Enabling Act of each of the public-land States admitted into the Union since 1802 has included grants of designated sections of federal lands for the purpose of supporting public schools.[7] Whether the Enabling Act contained words of present

status, subject, however, to the restrictions and conditions of the preceding and following paragraphs of this subsection." 43 U. S. C. § 852 (a).

Title 43 U. S. C. § 853 provides that in applying this statute to Utah, the words "sections sixteen and thirty-six" also include sections, two and thirty-two.

[6] "Because the western states are the ones most recently admitted to the Union and because Utah and Arizona are two of the three states that received particularly large grants, the remaining indemnity selection rights are concentrated in seven western states. Utah and Arizona alone hold nearly 70% of the outstanding indemnity rights. The approximate number of acres still to be selected in each state (and thus the approximate number of acres potentially affected by this lawsuit) is as follows: Arizona, 170,000 acres; California, 108,000 acres; Colorado, 17,000 acres; Idaho, 27,000 acres; Montana, 22,900 acres; Utah, 225,000 acres; and Wyoming, 1,100 acres." Brief for Petitioner 4–5, n. 2.

[7] "The first enactment for the sale of public lands in the western territory provided for setting apart section sixteen of every township for the maintenance of public schools (Ordinance of 1785; *Cooper* v. *Roberts*, 18 How. 173, 177); and, in carrying out this policy, grants were made for common school purposes to each of the public-land States admitted to the Union. Between the years 1802 and 1846 the grants were

or future grant, title to the numbered sections did not vest in the State until completion of an official survey. Prior to survey, the Federal Government remained free to dispose of the designated lands "in any manner and for any purpose consistent with applicable federal statutes." [8] In recognition of the fact that the essentially random grants in place might therefore be unavailable at the time of survey for a variety of reasons,[9] Congress authorized grants of indemnity or "lieu" lands of equal acreage.

As Utah correctly emphasizes, the school land grant was a "solemn agreement" which in some ways may be analogized to a contract between private parties. The United States agreed to cede some of its land to the State in exchange for a commitment by the State to use the revenues derived from the land to educate the citizenry.

The State's right to select indemnity lands may be viewed as the remedy stipulated by the parties for the Federal Gov-

---

of every section sixteen, and, thereafter, of sections sixteen and thirty-six. In some instances, additional sections have been granted." *United States* v. *Morrison*, 240 U. S. 192, 198 (footnotes omitted).

[8] "It has consistently been held that under the terms of the grants hitherto considered by this Court, title to unsurveyed sections of the public lands which have been designated as school lands does not pass to the State upon its admission into the Union, but remains in the Federal Government until the land is surveyed. Prior to survey, those sections are a part of the public lands of the United States and may be disposed of by the Government in any manner and for any purpose consistent with applicable federal statutes. If upon survey it is found that the Federal Government has made a previous disposition of the section, the State is then entitled to select lieu lands as indemnity in accordance with provisions incorporated into each of the school-land grants. The interest of the State vests at the date of its admission into the Union only as to those sections which are surveyed at that time and which previously have not been disposed of by the Federal Government." *United States* v. *Wyoming,* 331 U. S. 440, 443–444 (footnote omitted).

[9] These include the establishment of reservations for Indians or federal military purposes, and entries by individuals under the homestead laws. See, *e. g., Wisconsin* v. *Lane,* 245 U. S. 427, 432–433.

ernment's failure to perform entirely its promise to grant the specific numbered sections. The fact that the Utah Enabling Act used the phrase "lands equivalent thereto" and described the substituted lands as "indemnity lands" implies that the purpose of the substitute selections was to provide the State with roughly the same resources with which to support its schools as it would have had had it actually received all of the granted sections in place.[10] Thus, as is typical of private contract remedies, the purpose of the right to make indemnity selections was to give the State the benefit of the bargain.

The history of the general statutes relating to land grants for school purposes confirms this view. Thus, for example, in 1859, when confronted with the fact that many settlers had occupied unsurveyed lands that had been included in school grants, Congress confirmed the settlers' claims and granted to the States "other lands of like quantity." Ch. 58, 11 Stat. 385. The substitution of an equal quantity of land provided the States a rough measure of equal value.

The school land grants gave the States a random selection of public lands subject, however, to one important exception. The original school land grants in general, and Utah's in particular, did not include any numbered sections known to be mineral in character by the time of survey. *United States* v. *Sweet*, 245 U. S. 563. This Court so held even though the Utah Enabling Act "neither expressly includes mineral lands nor expressly excludes them." *Id.*, at 567. The Court's opinion stressed "the practice of Congress to make a distinction between mineral lands and other lands, to deal with them

---

[10] See *Heydenfeldt* v. *Daney Gold & Silver Mining Co.*, 93 U. S. 634, 639–640: "Until the *status* of the lands was fixed by a survey, and they were capable of identification, Congress reserved absolute power over them; and if in exercising it the whole or any part of a 16th or 36th section had been disposed of, the State was to be compensated by other lands equal in quantity, and *as near as may be in quality*." (Emphasis added.)

along different lines, and to withhold mineral lands from disposal save under laws specially including them." *Ibid.* Mineral lands were thus excluded not only from the original grants in place but also from the indemnity selections.[11] Since mineral resources provide both the most significant potential source of value and the greatest potential for variation in value in the generally arid western lands, the total exclusion of mineral lands from the school land grants is consistent with an intent that the States' indemnity selections of equal acreage approximate the value of the numbered sections lost.

In 1927, some nine years after the decision in *United States* v. *Sweet, supra,* Congress changed its policy to allow grants of school lands to embrace numbered sections that were mineral in character.[12] But the 1927 statute did not expand the kinds of land available for indemnity selections.[13] Thus, after 1927 even if the lost school lands were mineral in character, a State was prohibited from selecting mineral lands as indemnity. It was not until 1958 that Congress gave the States the right to select mineral lands to replace lost school lands, and that right was expressly conditioned on a determination that the lost lands were also mineral in character. 72 Stat. 928, 43 U. S. C. § 852. See n. 5, *supra.* For 30 years, then, States

---

[11] Under the 1891 general indemnity selection statute then in effect, selections were limited to "unappropriated, surveyed public lands, not mineral in character." 26 Stat. 796–797.

[12] The Act of January 25, 1927, 44 Stat. 1026–1027, provided that "the several grants to the States of numbered sections in place for the support or in aid of common or public schools be, and they are hereby, extended to embrace numbered school sections mineral in character." See 43 U. S. C. § 870.

[13] "[T]his Act shall not apply to indemnity or lieu selections or exchanges or the right hereafter to select indemnity for numbered school sections in place lost to the State under the provisions of this or other Acts, and all existing laws governing such grants and indemnity or lieu selections and exchanges are hereby continued in full force and effect." 44 Stat. 1027, 43 U. S. C. § 871.

were not even permitted to select lands roughly equivalent in value to replace lost mineral lands. The condition in the 1958 statute, that the lost lands be mineral in character before mineral lands could be selected as indemnity, rather clearly reflects an intention to restore the character of the indemnity selection as a substitute of roughly equal value.[14]

Throughout the history of congressional consideration of school land grants and related subjects—a history discussed at great length in the voluminous briefs submitted to us—we find no evidence whatever of any congressional desire to have the right to select indemnity lands do anything more than make the States whole for the loss of value resulting from the unavailability of the originally designated cross section of lands within the State. There is certainly no suggestion of a purpose at any time, including 1958, to allow the States to obtain substantially greater values through the process of selecting indemnity land.

Thus, viewing the program in this broad historical perspective, it is difficult to identify any sensible justification for Utah's position that it is entitled to select any mineral lands it chooses regardless of the value of the school sections lost. Nevertheless, Utah is quite correct in arguing that the Secretary has no power to reject its selections unless Congress has given it to him. We have no doubt that it has.

## II

Prior to the 1930's, cases in this Court had made it perfectly clear that the Federal Government retained the power to appropriate public lands embraced within school grants for other

---

[14] "Under present law the States are restricted to selecting non-mineral lands to replace forfeited school sections even when these sections are mineralized. There appears to be little equity in this situation." H. R. Rep. No. 2347, 85th Cong., 2d Sess., 2 (1958). "The objective of this legislation is merely to make whole the States which have pending in lieu selections of lands for preempted school sections." Remarks of Senator Watkins of Utah, 104 Cong. Rec. 11921 (1958).

purposes if it acted in a timely fashion. On the other hand, it was equally clear that the States' title to unappropriated land in designated sections could not be defeated after survey, and that their right to indemnity selections could not be rejected if they satisfied the statutory criteria when made, and if the selections were filed before the lands were appropriated for other purposes. The authority of the Secretary of the Interior was limited to determining whether the States' indemnity selections met the relevant statutory criteria. See *Wyoming* v. *United States,* 255 U. S. 489; *Payne* v. *New Mexico,* 255 U. S. 367, 371.

In the 1930's, however, dissatisfaction with the rather loose regime governing use and disposition of unappropriated federal lands, prompted mostly by the waste caused by unregulated stock grazing,[15] led to a series of congressional and executive actions that are critical to this case. By means of these actions, all unappropriated federal lands were withdrawn from every form of entry or selection. The withdrawal did not affect the original school land grants in place, whether or not surveyed, but did include all lands then available for school indemnity selections. The lands thus withdrawn were thereafter available for indemnity selections only as permitted by the Secretary of the Interior in the exercise of his discretion.

The sequence of events was as follows. In 1934, Congress enacted the Taylor Grazing Act "[t]o stop injury to the public grazing lands by preventing overgrazing and soil deterioration, to provide for their orderly use, improvement, and development, to stabilize the livestock industry dependent upon the public range, and for other purposes." 48 Stat. 1269. Section 1 authorized the Secretary of the Interior to establish grazing districts in up to 80 million acres of unappropriated federal lands; the establishment of such a district had the effect of withdrawing all lands within its boundaries "from all

---

[15] See H. R. Rep. No. 903, 73d Cong., 2d Sess. (1934); 78 Cong. Rec. 11139 (1934) (remarks of Sen. Adams of Colorado).

512

forms of entry of settlement." [16]   That section also expressly provided that "Nothing in this Act shall be construed in any way . . . to affect any land heretofore or hereafter surveyed

[16] *"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That in order to promote the highest use of the public lands pending its final disposal, the Secretary of the Interior is authorized, in his discretion, by order to establish grazing districts or additions thereto and/or to modify the boundaries thereof, not exceeding in the aggregate an area of eighty million acres of vacant, unappropriated, and unreserved lands from any part of the public domain of the United States (exclusive of Alaska), which are not in national forests, national parks and monuments, Indian reservations, revested Oregon and California Railroad grant lands, or revested Coos Bay Wagon Road grant lands, and which in his opinion are chiefly valuable for grazing and raising forage crops: *Provided,* That no lands withdrawn or reserved for any other purpose shall be included in any such district except with the approval of the head of the department having jurisdiction thereof.   Nothing in this Act shall be construed in any way to diminish, restrict, or impair any right which has been heretofore or may be hereafter initiated under existing law validly affecting the public lands, and which is maintained pursuant to such law except as otherwise expressly provided in this Act, nor to affect any land heretofore or hereafter surveyed which, except for the provisions of this Act, would be a part of any grant to any State, nor as limiting or restricting the power or authority of any State as to matters within its jurisdiction.   Whenever any grazing district is established pursuant to this Act, the Secretary shall grant to owners of land adjacent to such district, upon application of any such owner, such rights-of-way over the lands included in such district for stock-driving purposes as may be necessary for the convenient access by any such owner to marketing facilities or to lands not within such district owned by such person or upon which such person has stock-grazing rights.   Neither this Act nor the Act of December 29, 1916 (39 Stat. 862; U. S. C., title 43, secs. 291 and following), commonly known as the 'Stock Raising Homestead Act', shall be construed as limiting the authority or policy of Congress or the President to include in national forests public lands of the character described in section 24 of the Act of March 3, 1891 (26 Stat. 1103; U. S. C., title 16, sec. 471), as amended, for the purposes set forth in the Act of June 4, 1897 (30 Stat. 35; U. S. C., title 16, sec. 475), or such other purposes as Congress may specify.   Before grazing districts are created in any State as herein provided, a hearing shall be held in the State, after public notice thereof shall have been given,

which, except for the provisions of this Act, would be a part of any grant to any State. . . ." Thus, § 1 preserved the original school land grants, whether or not the designated sections had already been identified by survey, but the statute made no provision for school indemnity selections.[17]

Because the Taylor Grazing Act as originally passed in 1934 applied to less than half of the federal lands in need of more orderly regulation,[18] President Roosevelt promptly issued Ex-

---

at such location convenient for the attendance of State officials, and the settlers, residents, and livestock owners of the vicinity, as may be determined by the Secretary of the Interior. No such district shall be established until the expiration of ninety days after such notice shall have been given, nor until twenty days after such hearing shall be held: *Provided, however,* That the publication of such notice shall have the effect of withdrawing all public lands within the exterior boundary of such proposed grazing districts from all forms of entry of settlement. Nothing in this Act shall be construed as in any way altering or restricting the right to hunt or fish within a grazing district in accordance with the laws of the United States or of any State, or as vesting in any permittee any right whatsoever to interfere with hunting or fishing within a grazing district." 48 Stat. 1269–1270.

[17] Section 7 of the Act authorized the Secretary

". . . in his discretion, to examine and classify any lands within such grazing districts which are more valuable and suitable for the production of agricultural crops than native grasses and forage plants, and to open such lands to homestead entry in tracts not exceeding three hundred and twenty acres in area. Such lands shall not be subject to settlement or occupation as homesteads until after same have been classified and opened to entry after notice to the permittee by the Secretary of the Interior, and the lands shall remain a part of the grazing district until patents are issued therefor, the homesteader to be, after his entry is allowed, entitled to the possession and use thereof: *Provided,* That upon the application of any person qualified to make homestead entry under the public-land laws, filed in the land office of the proper district, the Secretary of the Interior shall cause any tract not exceeding three hundred and twenty acres in any grazing district to be classified, and such application shall entitle the applicant to a preference right to enter such lands when opened to entry as herein provided." 48 Stat. 1272.

[18] The bill originally introduced by Congressman Taylor in 1934 (H. R. 6462, 73d Cong., 2d Sess.) purported to authorize the protection of 173

ecutive Order No. 6910 [19] withdrawing all of the unappro-
priated and unreserved public lands in 12 Western States, in-
cluding Utah, from "settlement, location, sale or entry" pend-

million acres of public range lands by including them within grazing dis-
tricts. As enacted, however, the statute covered a maximum of 80 million
acres. This figure was increased to 142 million acres in 1936, 49 Stat.
1976, and the acreage limitation was removed entirely in 1954. 68 Stat.
151.

[19] The Order, quoted in *Executive Withdrawal Order*, 55 I. D. 205, 206–
207 (1935), reads as follows:

"WHEREAS, the act of June 28, 1934 (ch. 865, 48 Stat. 1269), pro-
vides, among other things, for the prevention of injury to the public
grazing lands by overgrazing and soil deterioration; provides for the
orderly use, improvement and development of such lands; and provides
for the stabilization of the livestock industry dependent upon the public
range; and

"WHEREAS, in furtherance of its purposes, said act provides for the
creation of grazing districts to include an aggregate area of not more than
eighty million acres of vacant, unreserved and unappropriated lands from
any part of the public domain of the United States; provides for the
exchange of State owned and privately owned lands for unreserved, sur-
veyed public lands of the United States; provides for the sale of isolated
or disconnected tracts of the public domain; and provides for the leasing
for grazing purposes of isolated or disconnected tracts of vacant, unre-
served and unappropriated lands of the public domain; and

"WHEREAS, said act provides that the President of the United States
may order that unappropriated public lands be placed under national
forest administration, if, in his opinion, the land be best adapted thereto;
and

"WHEREAS, said act provides for the use of public land for the con-
servation or propagation of wild life; and

"WHEREAS, I find and declare that it is necessary to classify all of
the vacant, unreserved and unappropriated lands of the public domain
within certain States for the purpose of effective administration of the
provisions of said act;

"NOW, THEREFORE, by virtue of and pursuant to the authority
vested in me by the act of June 25, 1910 (ch. 421, 36 Stat. 847), as
amended by the act of August 24, 1912 (ch. 369, 37 Stat. 497), and sub-
ject to the conditions therein expressed, it is ordered that all of the vacant,
unreserved, and unappropriated public land in the States of Arizona,

ing a determination of the best use of the land. The withdrawal affected the land covered by the Taylor Grazing Act as well as land not covered by the statute. The President's authority to issue Executive Order No. 6910 was expressly conferred by the Pickett Act.[20]

---

California, Colorado, Idaho, Montana, Nevada, New Mexico, North Dakota, Oregon, South Dakota, Utah, and Wyoming be, and it hereby is, temporarily withdrawn from settlement, location, sale or entry, and reserved for classification, and pending determination of the most useful purpose to which such land may be put in consideration of the provisions of said act of June 28, 1934, and for conservation and development of natural resources.

"The withdrawal hereby effected is subject to existing valid rights.

"This order shall continue in full force and effect unless and until revoked by the President or by act of Congress."

[20] In that Act, passed in 1910, Congress gave the President the authority to withdraw any public lands from "settlement, location, sale or entry":

"[T]he President may, at any time in his discretion, temporarily withdraw from settlement, location, sale, or entry any of the public lands of the United States . . . and reserve the same for water-power sites, irrigation, classification of lands, or other public purposes to be specified in the orders of withdrawals, and such withdrawals or reservations shall remain in force until revoked by him or by an Act of Congress." Ch. 421, 36 Stat. 847.

Although the description of the withdrawal power does not specifically mention state indemnity selections, the power as described is so broad and general that it seems clear that had such an exception been intended, Congress would have made it express.

In *Wyoming v. United States*, 255 U. S. 489, this Court plainly indicated that an executive withdrawal of federal land under the Pickett Act would defeat a later attempt to select any part of such land as indemnity for lost school sections. The holding in the case was that an indemnity selection's validity should be tested as of the time made, and that a subsequent Pickett Act withdrawal could not defeat an earlier selection by the State that was otherwise valid. If a Pickett Act withdrawal could not preclude a school land indemnity selection, there would have been no need for the Court to reach the timeliness issue.

The Pickett Act was repealed by the Federal Land Policy and Management Act of 1976, § 704 (a), 90 Stat. 2792, but all previous withdrawals

Congress responded to Executive Order No. 6910 by amending the Taylor Grazing Act in 1936 in two respects that are relevant to this case. First, it expanded the acreage subject to the Act, see n. 18, *supra.* Second, it revised § 7 of the Act, see n. 17, *supra,* to give the Secretary the authority, in his discretion, to classify both lands within grazing districts and lands withdrawn by the recent Executive Order as proper not only for homesteading, but also, for the first time, for satisfaction of any outstanding "lieu" rights, and to open such lands to "selection." The section, thus amended, provided in pertinent part: [21]

"The Secretary of the Interior is authorized, in his dis-

under the Pickett Act were expressly preserved unless and until modified. § 701 (c), 90 Stat. 2786.

In January 1936, President Roosevelt issued Executive Order No. 7274, which excluded from the operation of Executive Order No. 6910 lands which were then or which were thereafter placed within federal grazing districts. Once land was placed within a grazing district, the purpose of Order No. 6910 was, of course, satisfied.

[21] Section 7 of the Act, 48 Stat. 1272, as amended by the Act of June 26, 1936, § 2, 49 Stat. 1976, as set forth in 43 U. S. C. § 315f, reads in its entirety as follows:

"The Secretary of the Interior is authorized, in his discretion, to examine and classify any lands withdrawn or reserved by Executive order of November 26, 1934 (numbered 6910), and amendments thereto, and Executive order of February 5, 1935 (numbered 6964), or within a grazing district, which are more valuable or suitable for the production of agricultural crops than for the production of native grasses and forage plants, or more valuable or suitable for any other use than for the use provided for under this subchapter or proper for acquisition in satisfaction of any outstanding lieu, exchange or script rights or land grant, and to open such lands to entry, selection, or location for disposal in accordance with such classification under applicable public-land laws, except that homestead entries shall not be allowed for tracts exceeding three hundred and twenty acres in area. Such lands shall not be subject to disposition, settlement, or occupation until after the same have been classified and opened to entry: *Provided,* That locations and entries under the mining laws including the Act of February 25, 1920, as amended, may be made upon such withdrawn and reserved areas without regard to classification

cretion, to examine and classify any lands withdrawn or reserved by Executive order . . . or within a grazing district, which are . . . proper for acquisition in satisfaction of any outstanding lieu, exchange or script rights or land grant, and to open such lands to entry, selection, or location for disposal in accordance with such classification under applicable public-land laws. . . . *Such lands shall not be subject to disposition . . . until after the same have been classified. . . ."* (Emphasis added.)

The changes in this section were apparently prompted in part by the fact that while the Taylor Grazing Act withdrawal preserved the States' school grants in place, no provision had been made in the 1934 version for the States' indemnity selections from land within grazing districts even though the States had expressed the concern that "the establishment of a grazing district would restrict the State in its indemnity selections." [22] While this omission may not have been critical in 1934 when the Act was passed—since only about half of the unappropriated federal land was then affected—by 1936, as a consequence of Executive Order No. 6910, no land at all was available in the public domain for indemnity selections. It is therefore reasonable to infer that the amendments to § 7 were at least in part a response to the

---

and without restrictions or limitation by any provision of this subchapter. Where such lands are located within grazing districts reasonable notice shall be given by the Secretary of the Interior to any grazing permittee of such lands. The applicant, after his entry, selection, or location is allowed, shall be entitled to the possession and use of such lands: *Provided,* That upon the application of any applicant qualified to make entry, selection, or location, under the public-land laws, filed in the land office of the proper district, the Secretary of the Interior shall cause any tract to be classified, and such application, if allowed by the Secretary of the Interior, shall entitle the applicant to a preference right to enter, select, or locate such lands if opened to entry as herein provided."

[22] Letter of Fred W. Johnson, Commissioner of the General Land Office, Department of the Interior, reprinted in H. R. Rep. No. 903, 73d Cong., 2d Sess., 9 (1934).

complaint expressed in congressional hearings in 1935, that there was no land available under current law for indemnity selections.[23]

---

[23] See statement of John H. Page of Phoenix, Ariz.:

"[T]oo much thought in all of the hearings on the act was given to the grazing features, and very little attention was given to the mechanics and as to how it would affect all of the public-land laws that we have been functioning under. The result is that we are now tied up in just one general withdrawal of all public lands, and everything in the public-land structure and in all of the public-land laws and the contractual relations between the Government—and I refer to existing exchange acts and everything—they have all ceased to function.

"There is no land that can be acquired, there is no land that can be filed on for any purpose.

"I think all of you Senators will agree with me that there are other uses of the remaining public lands besides grazing. I term it generally to distinguish it from grazing, the use for industrial purposes; in other words, in Arizona a great many of our town sites or smelter sites and the like; those which have everything to do with industry, the title usually has been acquired by exchange selection, scrip, State selections. . . .

.        .        .        .        .

"When this bill was before Congress, I wrote our Senators and a great many of us did from Arizona, that we were all in sympathy with the grazing use, but that our fear was that they would get a little too enthusiastic about it and withdraw everything. In other words, I forecasted what has resulted, and I think in some measure that I was responsible for the 80,000,000-acre limitation that was put in. You remember that, Senator Hayden.

"That was just so that they would have to take the land that was suitable and not include everything. But then there was immediately, when it commenced to be administered, a general withdrawal of all remaining public lands." Hearing on S. 2539 before the Senate Committee on Public Lands and Surveys, 74th Cong., 1st Sess., 3 (1935).

That it was understood that no land was available for the States' school land indemnity selections was confirmed by Senator Hayden at the same hearings. In response to Mr. Page's observation that there was no land open to entry in Arizona for exercise of railroad-grant exchange rights, the Senator observed: "The same thing would be true of a grant made to a State for university purposes or an indemnity selection." Id., at 15.

Further, it was the clear position of the Interior Department in 1935

The 1936 amendment to § 7 rectified that problem, but did not give the States a completely free choice in making indemnity selections.[24]  Rather, Congress decided to route the States' selections through § 7, and thereby to condition their acceptance on the Secretary's discretion.  That decision was consistent with the dominant purpose of both the Act and Executive Order No. 6910 to exert firm control over the Nation's land resources through the Department of the Interior.  In sum, the Taylor Grazing Act, coupled with the withdrawals by Executive Order, "locked up" all of the federal lands in the Western States pending further action by Congress or the President, except as otherwise permitted in the discretion of the Secretary of the Interior for the limited purposes specified in § 7.

This was Congress' understanding of the Taylor Grazing Act in 1958 when it amended the school land indemnity selection statute to permit selection of mineral lands.  Both the House and Senate Reports specifically noted and adopted the Department of the Interior's assumption " 'that nothing in this bill is intended to affect the rights or duties of States under other laws' and, in particular, 'that no change is intended to be made in section 7 of the Taylor Grazing Act,

that all of the land withdrawn under President Roosevelt's Executive Order No. 6910 was unavailable for school land indemnity selections.  See *State of Arizona,* 55 I. D. 249, 253 (1935): "The law provides that indemnity lands may be taken for the school sections lost, but through the withdrawal of all public lands, there is no indemnity land to be obtained."

[24] Utah argues (see also dissenting opinion, *post,* at 530, n. 14) that the word "grant" in § 1 of the Taylor Grazing Act in the phrase, "[n]othing in this Act shall be construed in any way . . . to affect any land . . . which . . . [is] part of any grant to any State," includes not only grants in place but also the right to indemnity selections.  If Utah's construction of the language were correct, there would have been no need to amend § 7 to authorize indemnity selections.  Moreover, even if indemnity selections were contemplated by that phrase in § 1, the 1936 amendment to § 7 still requires that the lands selected first be reclassified by the Secretary in his discretion.

as amended (43 U. S. C., sec. 315f).'" H. R. Rep. No. 2347, 85th Cong., 2d Sess., 2 (1958).[25] Since Congress was specifically dealing with school indemnity selections, the Reports make it perfectly clear that Congress deemed school indemnity selections to be subject to § 7 of the Taylor Grazing Act. And since the congressional decision in 1958 to allow school land indemnity selections to embrace mineral lands was expressly conditioned on a determination that the lost school lands were also mineral in character, it is manifest that Congress did not intend to grant the States any windfall. It only intended to restore to the States a rough approximation of what was lost. See n. 14, *supra*.

We therefore hold that the 1936 amendment to the Taylor Grazing Act conferred on the Secretary the authority in his discretion to classify lands within a federal grazing district as proper for school indemnity selection. And we find no merit in the argument that the Secretary's "grossly disparate value" policy constitutes an abuse of the broad discretion thus conferred. On the contrary, that policy is wholly faithful to Congress' consistent purpose in providing for indemnity selections, to give the States a rough equivalent of the school land grants in place that were lost through pre-emption or private entry prior to survey. Accordingly, the judgment of the Court of Appeals is reversed.

*It is so ordered.*

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE, MR. JUSTICE BLACKMUN, and MR. JUSTICE REHNQUIST join, dissenting.

Since the early days of the Republic, the Federal Government's compact with each new State has granted the State land for the support of education and allowed the State to

---

[25] S. Rep. No. 1735, 85th Cong., 2d Sess., 2 (1958): "Reports of the Secretary of the Interior on S. 2517 and H. R. 12117 [which contained the language just quoted from the House Report] are incorporated as a part of this report."

select land of equal acreage as indemnity for deficiencies in the original grant. Today, the Court holds that the Taylor Grazing Act abrogated those compacts by approving selection requirements completely at odds with the equal acreage principle. Nothing in the Court's opinion persuades me that Congress meant so lightly to breach compacts that it has respected and enforced throughout our Nation's history. I therefore dissent.

The Court's decision rests on three fundamental misconceptions. First, the Court reasons from the accepted proposition that indemnity lands compensate the States for gaps in the original grants to the mistaken conclusion that the States have no right to lands of equal acreage. *Ante,* at 507–510. This argument ignores the clear meaning of statutes spanning about two centuries in which Congress specifically adopted an equal acreage principle as the standard for making compensation. Second, the Court believes that the establishment of grazing districts under the Taylor Grazing Act has the same effect as a withdrawal of lands under the Pickett Act. *Ante,* at 513–519. This belief manifests a serious misunderstanding of both the history of federal land management and the language of the Taylor Grazing Act. Third, the Court assumes—without discussion—that the Taylor Grazing Act gives the Secretary of the Interior discretion to reject indemnity selections under standards inconsistent with the criteria set out in the statutes authorizing the selections. Every federal court that has considered the Secretary's authority under the Taylor Grazing Act has rejected this assumption.

A correct understanding of this case requires careful examination of a labyrinth of compacts and statutes dating back to the early years of our national history. Part I of this opinion reviews the unbroken succession of laws that undercut the Court's construction of the school indemnity selection statutes. Part II explains the development of the Taylor Grazing Act and its relationship to the Executive Orders withdrawing land under the Pickett Act. Finally, through a detailed con-

sideration of the Taylor Grazing Act's critical provisions, Part III demonstrates that the Act will not permit the construction that the Court has given it.

## I

When the first 13 States formed the Union, each State had sovereign authority over the lands within its borders. These lands provided a tax base for the support of education and other governmental functions. When settlers sought to carve the State of Ohio from the Northwest Territory in 1802, they encountered a different situation. Vast tracts within the boundaries of the proposed State belonged to the Federal Government. Thus, the new State's potential revenue base would be restricted severely unless the Federal Government waived its immunity from taxation.[1] In order to place Ohio on an equal footing with the original States, Congress enacted a compromise drawn from the Land Ordinance of 1785[2] and the Northwest Ordinance of 1787.[3] The compromise set a pattern followed in the admission of virtually every other State.[4] Specific details varied from State to State, but the

---

[1] Congress did not address this problem in 1796 when Tennessee was created from land that North Carolina had ceded to the Confederation. Consequently, Tennessee contested congressional control over all vacant land within the State. The controversy ended with a compromise that established a federal reservation exempt from state taxation. Act of Apr. 18, 1806, ch. 31, §§ 1, 2, 2 Stat. 381–382; see P. Gates, History of Public Land Law Development 287–288 (1968).

[2] The Land Ordinance of 1785 "reserved the lot No. 16, of every township, for the maintenance of public schools within the said township. . . ." 1 Laws of the United States 565 (1815).

[3] Article III of the Northwest Ordinance of 1787 declared: "Religion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." 1 Stat. 52. Article IV provided that legislatures established in the region could not "tax . . . the property of the United States" or interfere with the Federal Government's disposal of the public lands. *Ibid.*

[4] The pattern established by the Ohio Enabling Acts, Act of Mar. 3, 1803, 2 Stat. 225; Act of Apr. 30, 1802, § 7, 2 Stat. 175, was followed in

basic plan persisted. As consideration for each new State's pledge not to tax federal lands, Congress granted the State a fixed proportion of the lands within its borders for the support of public education. *E. g.*, Act of Apr. 30, 1802, § 7, 2 Stat. 175 (Ohio); Act of Jan. 29, 1861, § 3, 12 Stat. 127–128 (Kansas); Act of July 16, 1894, §§ 3, 6, 28 Stat. 108–109 (Utah); see *United States* v. *Morrison,* 240 U. S. 192, 201 (1916).[5]

These agreements were solemn bilateral compacts between each State and the Federal Government. See *ante,* at 507; *United States* v. *Morrison, supra,* at 201–202; *Cooper* v. *Roberts,* 18 How. 173, 177–179 (1856). For its part, the Government granted the State specific sections of land within each township laid out by federal survey. The granted sections were specified by number to ensure that the State would receive a random cross section of the public land. Title to the sections vested in the State upon approval of the survey. *United States* v. *Morrison, supra,* at 207, 212; *Beecher* v. *Wetherby,* 95 U. S. 517 (1877). Should these grants in place prove unavailable, the Federal Government promised to grant the State indemnity in other lands of equal acreage. In return, Congress required the State to memorialize its pledge not to tax federal lands "by ordinance irrevocable without the consent of the United States." *E. g.*, Act of July 16, 1894, § 3, 28 Stat. 108 (Utah). Congress also imposed upon the State a binding and perpetual obligation to use the granted lands for the support of public education. All revenue from the sale or lease of the school grants was impressed with a

---

the Acts organizing every State except Maine, Texas, West Virginia, and Hawaii. See P. Gates, *supra* n. 1, at 285–339.

[5] Until shortly after Congress stopped selling public land on credit, Act of Apr. 24, 1820, § 2, 3 Stat. 566, State Enabling Acts also exempted land sold by Congress from state taxation for a period of five years after the sale. The Acts enabling the organization of Ohio and other States in the Northwest Territory contained only this proscription because the Northwest Ordinance of 1787 already banned state taxes on federal lands. See P. Gates, *supra* n. 1, at 288–296; n. 3, *supra.*

trust in favor of the public schools. No State could divert school lands to other public uses without compensating the trust for the full market value of the interest taken. *Lassen* v. *Arizona ex rel. Arizona Highway Dept.,* 385 U. S. 458 (1967); see *Alamo Land & Cattle Co.* v. *Arizona,* 424 U. S. 295 (1976).

A long line of statutes dating from the early 1800's evidences Congress' consistent respect for the federal obligation to replace unavailable school sections with indemnity lands of equal acreage. See *United States* v. *Morrison, supra,* at 201–202. In 1826, the first general indemnity selection statute appropriated additional tracts to compensate the States for lands lost when fractional townships were found not to contain the numbered section originally granted. The statute directed the Secretary of the Treasury to select "out of any unappropriated public land" within the township where the section had been lost the "quantity" of land to which the State was entitled. Act of May 20, 1826, ch. 83, 4 Stat. 179. When private claims against unsurveyed public lands increased as the Nation moved west, Congress also acted to indemnify States for school sections occupied by settlers. The earliest statutes authorized officials in particular States or Territories to select "other lands to an equal amount . . . in lieu of [the] sections so occupied. . . ." *E. g.,* Act of Mar. 2, 1853, § 20, 10 Stat. 179 (Washington Territory).[6]

In 1859, a second statute of general applicability appropriated "other lands of like quantity" to replace school sections pre-empted by prior settlement, "fractional in quantity," missing from a township, or lost "from any natural cause whatever." Act of Feb. 26, 1859, ch. 58, 11 Stat. 385. Although the statute incorporated by reference the selection provisions of the 1826 Act, a more particular statute passed on the same day expressly empowered local officials in one western

---

[6] See Act of Mar. 3, 1853, § 7, 10 Stat. 247 (California); Act of Jan. 7, 1853, ch. 6, 10 Stat. 150 (Oregon).

county to make their own indemnity selection. Upon filing with the local federal register, the statute declared, "the land so selected shall . . . belong to the school fund . . . in all respects the same as other school lands. . . ." Act of Feb. 26, 1859, ch. 59, 11 Stat. 385 (Sarpy County, Neb.).

The general statutes of 1826 and 1859, consolidated and codified as §§ 2275 and 2276 in the Revised Statutes of 1874, underwent extensive revision in 1891. The resulting law appropriated additional land to replace school sections lost because they were mineral in character, included within a federal reservation, or "otherwise disposed of by the United States." In lieu of unavailable school sections, each State was entitled to such "other lands of equal acreage . . . [as] may be selected by said State. . . ." Act of Feb. 28, 1891, ch. 384, 26 Stat. 796. The States could make their indemnity selections from "any unappropriated, surveyed public lands, not mineral in character, within the State. . . ." *Id.*, at 797.

The 1891 revision had at least four effects. First, it reaffirmed the States' unquestioned right to replace lost school sections with lands of equal acreage. Second, it removed the restriction that had limited indemnity selections to land within the township where the school section was unavailable. Third, it appeared to confirm this Court's earlier decision that school grants did not convey mineral lands to the States.[7] Fourth, it expressly conformed the general indemnity selection statutes to the mid-19th-century enactments that gave certain States the right to make their own indemnity selections. Even where the earlier statutes gave a State the power of selection, however, it had become accepted practice for the State to submit its selections for the approval of the Secretary of the Interior.[8] State Enabling Acts passed in 1889

---

[7] *Mining Co.* v. *Consolidated Mining Co.*, 102 U. S. 167 (1880); see *United States* v. *Sweet*, 245 U. S. 563, 570–572 (1918).

[8] See *Todd* v. *Washington*, 24 L. D. 106 (1897). The Secretary of the Interior assumed the Secretary of the Treasury's responsibility for the public lands in 1849. Act of Mar. 3, 1849, § 3, 9 Stat. 395.

and 1890 sanctioned the practice explicitly.[9] The 1891 revision of the general indemnity selection laws did not mention the need for federal approval, but the inclusion of an approval requirement in the Utah Enabling Act passed three years later suggests that the revision authorized no departure from the accepted practice. See Act of July 16, 1894, § 6, 28 Stat. 109.

By the end of the 19th century, the States' right to select land of equal acreage in lieu of lost school sections had been established for nearly 100 years. The only unsettled question was whether the Secretary of the Interior had discretion to disapprove the selections. In *Payne* v. *New Mexico*, 255 U. S. 367 (1921), this Court resolved that question in the States' favor. New Mexico had selected alternative land in exchange for school sections lying within a national forest. Before the Secretary approved the selection, the grants in place were restored to the public domain. The Secretary found that the restoration of the grants in place defeated the basis for the exchange selection. The Court held, however, that equitable title to properly selected land vested in the State when the selection was filed. If the selection satisfied the requirement of the general school grant statutes, the Secretary had no power to annul the State's title. *Id.,* at 370–371.

Three weeks later, the Court made the same point even more emphatically in *Wyoming* v. *United States,* 255 U. S. 489 (1921). In that case, the land selected by Wyoming in exchange for a school section lying within a national forest later was withdrawn by the Federal Government "as possible oil land." *Id.,* at 495. The Court again concluded that equitable title to the chosen land vested in the State on the date the selection was filed. It was not, the Court said,

"as if the selection was merely a proposal by the State

---

[9] See Act of July 10, 1890, § 4, 26 Stat. 223 (Wyoming); Act of July 3, 1890, § 4, 26 Stat. 215 (Idaho); Act of Feb. 22, 1889, § 10, 25 Stat. 679 (North Dakota, South Dakota, Montana, Washington).

which the [federal] land officers could accept or reject. They had no such option to exercise. . . . The power confided to them was not that of granting or denying a privilege to the State, but of determining whether an existing privilege conferred by Congress had been lawfully exercised. . . ." *Id.,* at 496.

In the years after *Payne* and *Wyoming,* Congress further expanded the States' rights to land for the support of public education. A 1927 statute declared that school grants were "to embrace numbered school sections mineral in character. . . ." Act of Jan. 25, 1927, § 1, 44 Stat., pt. 2, p. 1026. A 1958 amendment to the indemnity selection statutes, by then found in their present places as 43 U. S. C. §§ 851, 852, permitted States to select mineral lands as indemnity for lost school sections that were mineral in character. Act of Aug. 27, 1958, 72 Stat. 928. This provision reflected a congressional judgment that the ban on mineral land indemnity for lost mineral lands had denied the States the fair cross section of land values contemplated by the orginal numbered grants.[10] Congress also found that a rule which kept the States from replacing nonmineral land with mineral land "amply protected" the federal interest in preventing a windfall to the States. Congress therefore declined to depart from the fundamental equal acreage principle accepted since 1802. H. R. Rep. No. 2347, 85th Cong., 2d Sess., 2, 3–4 (1958). Indeed, Congress always has adhered to the equal acreage principle as its standard for just indemnification. As recently as 1966, when it amended 43 U. S. C. § 852 to allow indemnity selections from unsurveyed as well as surveyed public land, Congress rejected the Secretary of the Interior's proposal to import an "equal value concept" into the indemnity statutes.

---

[10] See 104 Cong. Rec. 11921 (1958) (remarks of Sen. Watkins of Utah, cosponsor of the bill).

See Act of June 24, 1966, Pub. L. 89–470, 80 Stat. 220; S. Rep. No. 1213, 89th Cong., 2d Sess., 2, 4–5 (1966).[11]

## II

The Utah Enabling Act of 1894 grants to the State four numbered sections within each township for the support of public education. If those sections "have been sold or otherwise disposed of" by the Federal Government, the Act—like other statutes of its kind—directs school grant indemnity lands "to be selected within said State in such manner as the legislature may provide, with the approval of the Secretary of the Interior. . . ." Act of July 16, 1894, § 6, 28 Stat. 109. In accordance with this direction, Utah has selected 194 tracts of mineral land as indemnity for lost school sections said to be mineral in character. Utah alleges that the tracts selected are unappropriated public land equal in acreage to the unavailable sections. Thus, the tracts appear to satisfy the basic indemnity selection requirements of 43 U. S. C. §§ 851, 852.

The Secretary, however, has refused to determine whether the selections satisfy the indemnity statutes. Instead, he claims that the Taylor Grazing Act of 1934, as amended, 43 U. S. C. § 315 *et seq.,* gives him discretion to disapprove the selection of indemnity lands "where the value of those lands greatly exceeds the value of the lost school lands for which the State seeks indemnity." App. 61. The Court today agrees. In an unprecedented departure, the Court concludes that Congress intended the Taylor Grazing Act to abrogate the equal acreage principle that Congress has reaffirmed repeatedly since 1802. The conclusion is implausible on its face, and the Taylor Grazing Act belies it. A full review of the Act's history and structure shows that this land management legisla-

---

[11] The Court points to nothing in nearly two centuries of American history to support its statement that the Secretary's comparative value concept is "wholly faithful to Congress' consistent purpose in providing for indemnity selections, to give the States a rough equivalent of the school grants in place that were lost. . . ." *Ante,* at 520.

tion affects only the States' right to make land exchanges. Indeed, the language of the Act—analyzed more closely in Part III of this opinion—expressly protects the States' indemnity selection rights from any impairment whatever.

The Taylor Grazing Act was intended to protect the public lands from spoliation while providing for the orderly satisfaction of valid claims against them. By the mid-1930's, the public ranges in the Western States were seriously endangered. Overgrazing had destroyed the better grasses, erosion had bared the steep hillsides, and silt had filled the waterholes. Homesteading on the better watered grounds aggravated the situation by leaving other lands without access to water. Finally, the disastrous decline of livestock prices during the Great Depression drove stockmen to make even greater use of free grazing on the already depleted public domain.[12] It was against this background that Congress in 1934 enacted the Taylor Grazing Act "to promote the highest use of the public lands pending its final disposal. . . ." § 1, 48 Stat. 1269.

Section 1 of the Act authorized the Secretary of the Interior "in his discretion, . . . to establish grazing districts . . . of vacant, unappropriated, and unreserved lands from any part of the public domain . . . , which in his opinion are chiefly valuable for grazing and raising forage crops. . . ." *Ibid.*[13] Land noticed for inclusion within a grazing district was withdrawn from "all forms of entry [or] settlement" until hearings could be conducted. *Id.,* at 1270. Congress carefully provided, however, that the Act was not to impede orderly disposition of the public lands. When some States objected

---

[12] See generally P. Gates, *supra* n. 1, at 519–529, 607–613.

[13] The Taylor Grazing Act further provided that the land included within grazing districts could not aggregate more than 80 million acres. § 1, 48 Stat. 1269. The acreage limitation rose to 142 million acres in 1936, Act of June 26, 1936, Title I, § 1, 49 Stat. 1976, and it disappeared entirely in 1954, Act of May 28, 1954, § 2, 68 Stat. 151.

to an earlier draft of the Act "upon the theory that the establishment of a grazing district would restrict [a] State in its indemnity selections," Congress recast § 1 to declare expressly that

"[n]othing in this Act shall be construed in any way to diminish, restrict, or impair any right which has been heretofore or may be hereafter initiated under existing law validly affecting the public lands . . . except as otherwise expressly provided in this Act, nor to affect any land heretofore or hereafter surveyed which, except for the provisions of this Act, would be a part of any grant to any State. . . ." *Id.*, at 1269.[14]

---

[14] The last part of the provision was added to the statute by the House Committee on the Public Lands. See Hearings on H. R. 2835 and H. R. 6462 before the House Committee on the Public Lands, 73d Cong., 1st Sess. and 2d Sess., 195 (1934). At the time the language was inserted, the Committee had before it a report from the Secretary of the Interior indicating that some States had objected to the bill "upon the theory that the establishment of a grazing district would restrict the State in its indemnity selections." *Id.*, at 5 (memorandum from General Land Office Commissioner Johnson to Secretary Ickes); see H. R. Rep. No. 903, 73d Cong., 2d Sess., 9 (1934); S. Rep. No. 1182, 73d Cong., 2d Sess., 7 (1934). The Senate further expanded the exemption. See 78 Cong. Rec. 11147 (1934); Hearings on H. R. 6462 before the Senate Committee on Public Lands and Surveys, 73d Cong., 2d Sess., 64 (1934). The House conferees acceded to the Senate amendment, after inserting the phrase "validly affecting the public lands" behind the words "existing law." See H. R. Conf. Rep. No. 2050, 73d Cong., 2d Sess., 1, 4 (1934).

The Court simply ignores this highly relevant sequence of events. It even cites the Secretary's report on the States' concern for the plainly erroneous proposition that the original Act made "no provision . . . for the States' indemnity selections from land within grazing districts. . . ." *Ante,* at 517. Perhaps the Court's confusion arises from its assumption that the broad saving provision covers only lands specifically granted, rather than all lands needed for satisfaction of a grant. *Ante,* at 519, n. 24. This assumption is logically untenable. Lands selected in lieu of deficiencies in a grant cannot be conveyed to the grantee unless they become "part of [the] grant." 48 Stat. 1269.

Section 7 also gave the Secretary discretion to reclassify land within a grazing district as "more valuable and suitable for the production of agricultural crops than native grasses and forage plants. . . ." *Id.*, at 1272. Upon reclassification, such land again became "subject to settlement or occupation as homesteads. . . ." *Ibid.*

The Act contained critically important provisions for land exchanges. Section 8 authorized the Secretary to accept private and state land within a grazing district in exchange for any surveyed public land of no more than "equal value." *Id.*, at 1272–1273. The section showed special solicitude for the States by directing the Secretary to proceed with state-initiated exchanges "at the earliest practicable date, and to cooperate fully with the State to that end. . . ." *Id.*, at 1273. The Western States, however, objected to the discretionary exchange provisions. The Governor of Wyoming, for example, opposed the Act because he feared that § 8 would impair the State's right to exchange school sections isolated inside a federal reservation or a grazing district for other, better situated acreage. In testimony before the Senate Committee, he argued that the Secretary might not allow enough exchanges to permit the removal of state land from inside federally administered areas. The Governor therefore urged that the Act's exchange provisions should be mandatory.[15] Testimony given by the Executive Secretary of the Utah Land Board expressed the same concerns.[16] The State Land Commissioner of Arizona also suggested that the Act would prevent private citizens from exercising their legitimate rights

---

[15] Hearings on H. R. 6462 before the Senate Committee on Public Lands and Surveys, 73d Cong., 2d Sess., 195–209 (1934) (testimony of Gov. Miller of Wyo.).

[16] *Id.*, at 209–216 (testimony of George Fisher). Not until Congress amended the Taylor Grazing Act in 1936 was the Secretary of the Interior required to effect exchanges of state-owned lands. See *infra*, at 534.

against lands included in a grazing district.[17]   Although the Secretary argues that these witnesses opposed the Act because it impaired the States' right to make indemnity selections, nothing in their testimony supports that conclusion. Indeed, the testimony of all three witnesses is most remarkable for its failure to suggest that they thought the Taylor Grazing Act would interfere with school grant indemnity selections by the Western States.

Five months after the Act went into effect, President Roosevelt issued Executive Order No. 6910 (1934).. Invoking his authority under the Pickett Act of 1910,[18] the President withdrew all unreserved and unappropriated public lands in 12. Western States "from settlement, location, sale or entry . . . pending determination of the most useful purpose to which such land may be put. . . ."   The effect of this Pickett Act withdrawal was far-reaching.   Although homesteading and other activities continued under existing claims, new entries upon the public domain came to a halt.   See 55 I. D. 205 (1935).   The withdrawal also forestalled States and private citizens from exercising their exchange, scrip, or indemnity rights to appropriate public land.   See *State of Arizona,* 55 I. D. 249, 253–254 (1935).[19]

---

[17] Hearings on H. R. 6462, *supra,* at 161–174 (testimony of Howland J. Smith).

[18] The Pickett Act of 1910, ch. 421, 36 Stat. 847, authorized the President temporarily to "withdraw from settlement, location, sale, or entry any of the public lands of the United States . . . , and reserve the same for water-power sites, irrigation, classification of lands, or other public purposes. . . ."   The Act was repealed by the Federal Land Policy and Management Act of 1976, § 704 (a), 90 Stat. 2792.

[19] This Court later held that a Pickett Act withdrawal is a "previous disposition" of land by the Federal Government that prevents title to numbered school sections from vesting in the States upon completion of a survey.   *United States* v. *Wyoming,* 331 U. S. 440, 443–444, 454 (1947). Executive Order No. 7599, 2 Fed. Reg. 633 (1937), however, expressly exempted numbered school sections from the operation of Executive Order No. 6910.

Only months after the Order issued, the Senators from Arizona began hearings on a proposal to undercut the withdrawal by broadening the Secretary's powers under §§ 7 and 8 of the Taylor Grazing Act.[20] The bill suffered a pocket veto, but an almost identical bill became law in 1936. Act of June 26, 1936, Title I, 49 Stat. 1976. In the meantime, Executive Order No. 7274 (1936) excluded from the operation of the earlier Order "all lands which are now, or may hereafter be, included within grazing districts. . . ." Thus, by the time the bill was enacted, the Pickett Act withdrawal had no further effect on lands administered under the Taylor Grazing Act.[21]

The 1936 enactment significantly amended §§ 7 and 8 of the Taylor Grazing Act. The amendment to § 7 authorized the Secretary of the Interior to classify lands withdrawn by Executive Order No. 6910 or "within a grazing district" as "more valuable or suitable" for uses other than grazing or as "proper for acquisition in satisfaction of any outstanding lieu, exchange or script [sic] rights or land grant. . . ." 49 Stat. 1976.[22] Such land would be open "to entry, selection, or

---

[20] See Hearings on S. 2539 before the Senate Committee on Public Lands and Surveys, 74th Cong., 1st Sess., 1–2 (1935). See also S. Rep. No. 1005, 74th Cong., 1st Sess., 2 (1935).

Five days after the hearings began, the President limited his earlier withdrawal by amending Executive Order No. 6910 to authorize exchanges of land under § 8 of the Taylor Grazing Act. Exec. Order No. 7048 (1935). Participants in the congressional hearings accurately observed, however, that Executive Order No. 6910 had left no land available for school grant indemnity selection. See ante, at 518–519, n. 23; supra, at 532.

[21] The Court scarcely mentions Executive Order No. 7274. It therefore fails to recognize that the land within a grazing district is "locked up" only to the extent that the Taylor Grazing Act affirmatively precludes otherwise legitimate claims against it. See ante, at 519. Any implication that the Pickett Act continues to affect lands within a grazing district is simply mistaken. See ante, at 515–516, n. 20; n. 24, infra.

[22] The Senate Report on this amendment says that it was intended "to provide a more practicable and satisfactory method of classification of

location" under the applicable public land laws. The statute directed the Secretary to respond to an application for entry by classifying the subject land, but no lands were to be appropriated "until after the same have been classified and opened to entry. . . ." *Ibid.*

The amendment to § 8 made mandatory the Taylor Grazing Act's provisions for the exchange of state-owned land.[23] Upon the receipt of any State's application for an exchange, the statute now provided, the Secretary "shall, and is hereby, directed to proceed with such exchange at the earliest practicable date and to cooperate fully with the State to that end. . . ." *Id.,* at 1977. Furthermore, the Secretary was authorized to make exceptions to the equal value requirement that remained applicable to exchanges of private land. The federal land exchanged for state land could be "either of equal value or of equal acreage." *Ibid.*

### III

Two specific provisions of the Taylor Grazing Act are critical to the Court's resolution of this case. The Court first must demonstrate that § 1 of the Act, 43 U. S. C. § 315, does not exclude the State's school grant indemnity rights from the reach of the statute. The Court then must establish that § 7 of the Act, 43 U. S. C. § 315f, gives the Secretary of the Interior power to disapprove the selection of lands that satisfy

---

lands within a grazing district and to make available for *private* entry lands which are more valuable for other purposes than grazing." S. Rep. No. 2371, 74th Cong., 2d Sess., 2 (1936) (emphasis added). The legislative history provides no support for the Court's inference that the amendment was a response to complaints about the effect of the Taylor Grazing Act—as distinguished from Executive Order No. 6910—upon *state* indemnity selections. See *ante,* at 517–518, 519, n. 24.

[23] See S. Rep. No. 2371, 74th Cong., 2d Sess., 2 (1936). Mandatory exchanges were critically important to the Western States. See *supra,* at 531–532.

all requirements of the school grant indemnity statutes, 43 U. S. C. §§ 851, 852. The Court fails to clear either hurdle because neither section of the Act permits the construction that the Court would give it. The plain language of § 1 protects school grant indemnity rights from the operation of the statute. And even if the Act applied to school grants, § 7 would not give the Secretary discretion to reject otherwise proper indemnity selections.

A

Section 1 of the Taylor Grazing Act provides that nothing in the statute shall "affect any land . . . which [otherwise] would be a part of any grant to any State. . . ." The exemption is transparently clear. All grants made by the compacts between the States and the Federal Government are completely unaffected by the Taylor Grazing Act. Thus, the establishment of a grazing district is not a federal "reservation" or "disposition" of land that can prevent title to numbered school sections from vesting in the States. See 43 U. S. C. § 851. Furthermore, designated grazing land remains "unappropriated" and available for the satisfaction of school grants under the terms of the indemnity statutes. See 43 U. S. C. §§ 852 (a) and (d). The purpose of the Act is simply to provide that unsurveyed or unselected school land, like other public land, can be included in grazing districts "[i]n order to promote [its] highest use . . . pending its final disposal." 43 U. S. C. § 315.

The Court gives the unqualified exemption in § 1 a construction that is inconsistent with its plain language and the stated purpose of the Act. The Court concedes that the inclusion of numbered school sections within a grazing district is not a federal disposition of the land that can defeat the grants in place. *Ante,* at 513.[24] It holds, however, that the

---

[24] Given the Court's concession on this point, its reliance on *United States* v. *Wyoming,* 331 U. S. 440 (1947), is misplaced. *Ante,* at 515, n. 20;

inclusion of other lands within a grazing district is a federal appropriation that can defeat a State's otherwise clear right to replace lost school sections with lands of equal acreage. *Ante,* at 519. Thus, the Court thinks the Taylor Grazing Act does "affect . . . land . . . which [otherwise] would be . . . part of" a grant to a State. Indeed, the Court concludes that the Act gives the Secretary of the Interior power to nullify an earlier congressional "disposal" of public land. This construction is wholly at odds with the express language and the clear history of the Act.

## B

Even if I could agree with the Court that § 1 of the Taylor Grazing Act exempts only numbered school sections from the operation of the Act, I could not agree with the Court's unexplained conclusion that § 7 allows the Secretary of the Interior to review school grant indemnity selections under a comparative value standard. Section 7 of the Act, 43 U. S. C. § 315f, gives the Secretary discretion to reclassify designated grazing lands as

"[i] more valuable or suitable for the production of agricultural crops than for the production of native grasses and forage plants, or [ii] more valuable or suitable for any other use than for [grazing], or [iii] proper

---

see *supra,* at 533, and n. 21. In that case, the United States sought to quiet title to oil land lying within one of the State's numbered school sections. The land had been withdrawn under the Pickett Act of 1910, ch. 421, 36 Stat. 847, several months before a survey identified it as a school section. The Court held that the Pickett Act withdrawal was a "previous disposition" by the Federal Government that prevented title to the school section from vesting in the State upon completion of the survey. 331 U. S., at 433–444, 454. Since the Taylor Grazing Act—unlike the Pickett Act—does not "dispose" of otherwise unreserved public lands, *United States* v. *Wyoming* provides no support for the notion that the Act withdrew grazing lands from indemnity selection under the provisions of the State Enabling Acts and the school indemnity statutes.

for acquisition in satisfaction of any outstanding lieu, exchange or script [*sic*] rights or land grant, and to open such lands to entry, selection, or location for disposal in accordance with such classification under applicable public-land laws. . . ."

The Courts of Appeals have concluded that this section gives the Secretary substantial discretion to conserve the public lands. Thus, the Secretary may reject private applications for land that he finds suitable for more efficient uses. See *Bleamaster* v. *Morton,* 448 F. 2d 1289 (CA9 1971); *Carl* v. *Udall,* 114 U. S. App. D. C. 33, 37–38, 309 F. 2d 653, 657–658 (1962). The courts also have upheld administrative determinations that certain land is not proper for private acquisition because the relevant land grant did not convey lands of that character. See *Pallin* v. *United States,* 496 F. 2d 27, 34–35 (CA9 1974); *Finch* v. *United States,* 387 F. 2d 13, 15–16 (CA10 1967), cert. denied, 390 U. S. 1012 (1968). But these federal courts agree that § 7 of the Taylor Grazing Act does not give the Secretary authority to review a land selection under standards fundamentally inconsistent with the terms of the relevant land grant statutes. See *Pallin* v. *United States, supra; Bronken* v. *Morton,* 473 F. 2d 790, 795–796 (CA9), cert. denied, 414 U. S. 828 (1973); *Finch* v. *United States, supra.* The word "proper" in the third clause of § 7 quoted above cannot mean proper under whatever criteria the Secretary sees fit to devise.

Nothing in this general provision, concerned with the satisfaction of private as well as state claims, suggests that Congress intended to authorize a comparative value standard at odds with the equal acreage principle found in every school grant indemnity statute since the beginning of the 19th century. When a specific statute grants fixed acreages, the Secretary cannot defeat the grant by applying a comparative value test based on the general provisions of § 7. *Bronken* v. *Morton, supra.* This rule should apply with special force where the

Federal Government has granted fixed quantities of land to a State as part of the bilateral compact under which the State was admitted to the Union. Even the exchange provisions in § 8 of the Taylor Grazing Act acknowledged the equal acreage principle. The section allowed the Secretary to accept private lands only in return for public lands of no more than "equal value," 43 U. S. C. § 315g (b) (1970 ed.), but it authorized him to take state-owned lands in exchange for "land either of equal value or of equal acreage," § 315g (c). Having expressly acknowledged the equal acreage principle in a section dealing with the exchange of lands to which the States already hold title, the Act could not silently have authorized departures from that principle in a section dealing with indemnity for deficiencies in the original land grants.

The Congress that passed the indemnity provision under which Utah has made its selections found that a law permitting the selection of mineral lands as indemnity for other mineral lands of equal acreage "amply protected" the federal interest. H. R. Rep. No. 2347, 85th Cong., 2d Sess., 2 (1958). The sponsors of the legislation and the Department of the Interior did not conclude—as the Court does—that such selections would allow the States to secure an unfair advantage. Instead, they agreed that the selection of mineral lands on an equal acreage basis was necessary to guarantee the public schools a "fair cross section of land values." *Id.,* at 4 (report of the Department of the Interior); 104 Cong. Rec. 11921 (1958) (remarks of Sen. Watkins); see *supra,* at 527. No later Congress has receded from this view, despite the Secretary's invitation to do so. See S. Rep. No. 1213, 89th Cong., 2d Sess., 2, 4 (1966); *supra,* at 527–528. For nearly 180 years, Congress has adhered to the equal acreage principle embodied in the specific statutes most relevant to this case. The Court has no basis for surmising that a general statute addressed to different issues has given the Secretary authority to adopt an inconsistent position.

## IV

Utah has selected land in satisfaction of grants made to support the public education of its citizens. Those grants are part of the bilateral compact under which Utah was admitted to the Union. They guarantee the State a specific quantity of the public lands within its borders. *Payne* v. *New Mexico*, 255 U. S. 367 (1921), and *Wyoming* v. *United States*, 255 U. S. 489 (1921), require the Secretary of the Interior to approve Utah's indemnity selections if they designate tracts equal in acreage to the lands replaced and otherwise satisfy the requirements of 43 U. S. C. §§ 851, 852. Nothing in the Taylor Grazing Act empowers the Secretary to review Utah's selections under a comparative value standard explicitly at odds with principles consistently respected since the early days of our Republic.

For a decade or longer, however, the Secretary has refused to determine whether Utah's selections satisfy §§ 851 and 852. Indeed, he has refused to make any determination at all. Rather, the Secretary has claimed that the Taylor Grazing Act gives him discretion to disapprove the selection of indemnity lands more valuable than Utah's lost school sections. In the five years since Utah took issue with that claim, the registry of the District Court has swollen with the proceeds of oil shale leases on the selected land—proceeds which the Federal Government now claims on the ground that the Secretary has not approved the indemnity selections. The District Court brought this matter to a just conclusion. It ordered the Secretary to do his duty. The Court of Appeals affirmed, and I would affirm its judgment.