SUPREME COURT OF ARIZONA
En Banc

|  |  |
|---|---|
| IN RE GENERAL ADJUDICATION OF ALL RIGHTS TO USE WATER IN THE GILA RIVER SYSTEM AND SOURCE<br><br>IN RE GENERAL ADJUDICATION OF ALL RIGHTS TO USE WATER IN THE LITTLE COLORADO RIVER SYSTEM AND SOURCE | ) Arizona Supreme Court<br>) No. WC-11-0001-IR<br>)<br>)<br>) Maricopa County Superior<br>) Court Case Nos.: W-1, W-2,<br>) W-3 and W-4<br>) (Consolidated) (Gila)<br>) [Contested Case<br>)  No. W1-104]<br>)<br>) Apache County Superior<br>) Court Case No. 6417 (LCR)<br>) [Contested Case<br>)  No. 6417-100]<br>)<br>)<br>) **O P I N I O N**<br>) |

Review from the Superior Court
in Apache County and Maricopa County
The Honorable Eddward P. Ballinger, Jr., Judge

**AFFIRMED**

---

THOMAS C. HORNE, ARIZONA ATTORNEY GENERAL                    Phoenix
     By    Thomas C. Horne, Attorney General
           Theresa M. Craig, Assistant Attorney General
Attorneys for the State of Arizona

THE SPARKS LAW FIRM PC                                     Scottsdale
     By    Joe P. Sparks
           Laurel A. Herrmann
Attorneys for the San Carlos Apache Tribe and Tonto Apache Tribe

SALMON LEWIS & WELDON PLC                                    Phoenix
     By    M. Byron Lewis
           John B. Weldon, Jr.
           Mark A. McGinnis
Attorneys for Salt River Project Agricultural Improvement and
Power District and Salt River Valley Water Users' Association

SALMON LEWIS & WELDON PLC                               Phoenix
     By   Paul R. Orme
Attorney for Central Arizona Irrigation and Drainage District
and Maricopa-Stanfield Irrigation & Drainage District

SNELL & WILMER LLP                                     Phoenix
     By   L. William Staudenmaier, III
          Andrew M. Jacobs
Attorneys for Arizona Public Service Company, Freeport-
McMoran Corporation, Roosevelt Water Conservation District

POLSINELLI SHUGHART PC                                 Phoenix
     By   Lucas J. Narducci
          Margaret LaBianca
Attorneys for BHP Copper Inc.

ENGELMAN BERGER PC                                     Phoenix
     By   William H. Anger
Attorney for City of Avondale, City of Chandler, City of
Glendale, City of Mesa, City of Scottsdale

BROWN & BROWN LAW OFFICES PC
     By   David Albert Brown                         St. Johns
          Douglas E. Brown                              Eagar
Attorneys for City of Cottonwood, City of Show Low,
Franklin Irrigation District, Aztec Land and Cattle
Company Ltd.

BALLARD SPAHR LLP                                      Phoenix
     By   Lee A. Storey
          Sara V. Ransom
Attorneys for City of Flagstaff

GARY VERBURG, PHOENIX CITY ATTORNEY                    Phoenix
     By   Gary Verburg, City Attorney
          Cynthia S. Campbell, Assistant City Attorney
          Daniel L. Brown, Assistant City Attorney
Attorneys for City of Phoenix

MOYES SELLERS & HENDRICKS                              Phoenix
     By   Steven L. Wene
Attorney for City of Safford

GILA RIVER INDIAN COMMUNITY                            Sacaton
     By   Linus Everling
          Thomas L. Murphy, Sr.
Attorneys for Gila River Indian Community

2

FENNEMORE CRAIG PC                                          Phoenix
     By   Lauren J. Caster
          Gregory Loyd Adams
Attorneys for ASARCO LLC and Catalyst Paper (Snowflake) Inc.

LAW OFFICE OF L. ANTHONY FINES PC                           Tucson
     By   L. Anthony Fines
Attorney for Gila Valley Irrigation District

NAVAJO NATION DEPARTMENT OF JUSTICE                     Window Rock
     By   Stanley M. Pollack

And

MCELROY MEYER WALKER & CONDON PC                       Boulder, CO
     By   Scott McElroy
Attorneys for Navajo Nation

MONTGOMERY & INTERPRETER PLC                            Scottsdale
     By   Susan B. Montgomery
          Robyn L. Interpreter
Attorneys for Yavapai-Apache Nation

UNITED STATES DEPARTMENT OF JUSTICE                 Washington, DC
     By   Robert G. Dreher, Acting Assistant Attorney General
          F. Patrick Barry
          Mary Gabrielle Sprague
Attorneys for United States of America

ARIZONA DEPARTMENT OF WATER RESOURCES                      Phoenix
     By   Kenneth C. Slowinski
          David S. Johnson
Attorneys for Amicus Arizona Department of Water Resources

_____

**P E L A N D E R**, Justice

¶1      The State of Arizona filed an interlocutory appeal from an order issued in the general stream adjudications of the Gila River System and Source and the Little Colorado River System and Source.  At issue is whether federal water rights

were impliedly reserved on lands granted by the United States government to the State of Arizona to support education and other public institutions ("State Trust Lands"). We accepted review and now affirm the superior court's ruling that there are no implied federal reserved water rights for State Trust Lands.

## I. HISTORICAL BACKGROUND

¶2 In 1787, the federal government established a policy to support public schools in new territories. *See* Northwest Ordinance, Act of Aug. 7, 1789, ch. 8, 1 Stat. 50, 51–52 n.(a) (affirming the 1787 Act of the Continental Congress). Congress furthered this policy by granting land from the public domain to new territories and states to be used for educational purposes. *See Lassen v. Arizona ex rel. Ariz. Highway Dep't*, 385 U.S. 458, 460 (1967). When Congress established the New Mexico Territory, which included the present State of Arizona, it "reserved for the purpose of being applied to schools" township sections sixteen and thirty-six. Act of Sept. 9, 1850, ch. 49, § 15, 9 Stat. 446, 452 ("Organic Act"). Four years later, Congress "reserved for the establishment of a University" a grant of land equal to two townships. Act of July 22, 1854, ch. 103, § 6, 10 Stat. 308, 309.

¶3 Congress gave these land grants to Arizona when it separated the Arizona Territory from the New Mexico Territory. Act of Feb. 24, 1863, ch. 56, 12 Stat. 664, 665. In 1881,

4

Congress provided the Arizona Territory with another grant of seventy-two sections of land, "withdrawn from sale," to support a university. Act of Feb. 18, 1881, ch. 61, 21 Stat. 326.

¶4 In 1910, Congress passed the Arizona–New Mexico Enabling Act ("Enabling Act"), which set forth the requirements for the two territories to become states. Act of June 20, 1910, ch. 310, 36 Stat. 557. The Enabling Act confirmed the prior land grants and also granted sections two and thirty-two in every township to support the common schools. *Id.* § 24, 36 Stat. at 572. It also provided "bulk" grants consisting of a set number of acres for other specific purposes, including universities; government buildings; prisons; insane asylums; a school for the deaf and blind; normal schools; charitable, penal, and reform institutions; agricultural and mechanical colleges; a school of mines; military institutes; and the payment of certain bonds. *Id.* § 25, 36 Stat. at 573.

¶5 In some instances, the particular sections granted to support common schools ("section-in-place grants") were no longer available when the townships were finally surveyed because those sections had been settled, reserved for Indian tribes, or otherwise reserved or disposed of under federal law. *See Report of the State Land Commission of Arizona* 16, 41–42, 67 (1912-1914) [hereinafter *Land Comm'n Report*]. To indemnify the state for these preempted sections, Congress appropriated lands

of like quantity ("indemnity-in-lieu selections") and authorized the state to select and receive such lands. Act of Feb. 28, 1891, ch. 384, 26 Stat. 796, 796–97; Act of Feb. 26, 1859, ch. 58, 11 Stat. 385. The state acquired a fee interest in the State Trust Lands upon completion of a survey for section-in-place grants, and upon selection and approval by the Secretary of the Interior ("Secretary") for the bulk-grant and indemnity-in-lieu selections. Enabling Act, §§ 24, 29, 36 Stat. at 572–74, 575–76; *see Andrus v. Utah* (*Andrus*), 446 U.S. 500, 506–07 (1980); *Land Comm'n Report* at 13–14.

**¶6**         The Enabling Act required Arizona to hold granted lands in trust:

> [A]ll lands hereby granted, including those which, having been heretofore granted to the said Territory, are hereby expressly transferred and confirmed to the said State, shall be by the said State held in trust, to be disposed of in whole or in part only in manner as herein provided and for the several objects specified in the respective granting and confirmatory provisions, and that the natural products and money proceeds of any of said lands shall be subject to the same trusts as the lands producing the same.

§ 28, 36 Stat. at 574. The Act set forth lease and sale requirements that may be enforced by the federal government, the state, or any Arizona citizen. *Id.* § 28, 36 Stat. at 574–75. The state, however, was given exclusive control of the beneficiary schools, colleges, and universities subject to the condition that trust proceeds support only non-sectarian and

6

non-denominational institutions. *Id.* § 26, 36 Stat. at 573–74.

**¶7** At statehood, Arizona consented to the terms and conditions of the Enabling Act, Ariz. Const. art. 10, § 1, art. 20, ¶ 12, and eventually received almost eleven million acres of State Trust Lands for the benefit of public institutions, *Lassen*, 385 U.S. at 460. Congress expected the grants to produce a fund through sale and use of the lands. *Lassen*, 385 U.S. at 463.

**¶8** The state currently manages more than 9.2 million acres of State Trust Lands, with approximately 1.4 million acres in the Little Colorado River Basin and approximately 5.1 million acres in the Gila River Basin. Although adjudication of claims for waters in those two river systems continues, it is well known that "the amount of surface water available [in Arizona] is insufficient to satisfy all needs." *United States v. Superior Court*, 144 Ariz. 265, 270, 697 P.2d 658, 663 (1985).

## II. PROCEDURAL BACKGROUND

**¶9** These consolidated cases originated in proceedings initiated by water rights claimants who filed with the Arizona State Land Department (ASLD) in the 1970s, under then-existing statutory adjudication procedures. *See* A.R.S. §§ 45-231 to -245, repealed by 1979 Ariz. Sess. Laws, ch. 139, § 38, eff. Apr. 24, 1979. Much has occurred since then. Now, a single water judge presides over both adjudications. Ariz. Sup. Ct.

Order (Jan. 17, 2002); Ariz. Sup. Ct. Order (Dec. 19, 2000). A special master initially conducts hearings and files reports with the court. A.R.S. § 45-257 (2012). To date, more than 14,000 and 82,000 claims have been made in the Little Colorado and Gila River adjudications respectively.[1]

¶10 The State moved for partial summary judgment in the Little Colorado and Gila River adjudications to recognize federal reserved water rights for State Trust Lands.[2] After briefing and oral argument, the special master concluded that federal reserved water rights do not apply to such lands. He submitted a report to the superior court, which adopted the master's findings and conclusions that support the court's ruling that the reserved water rights doctrine is inapplicable to State Trust Lands. The court therefore denied the State's

---

[1] The adjudications' histories are lengthy and complex. For additional factual and procedural background, see *Arizona v. San Carlos Apache Tribe*, 463 U.S. 545, 557–59 (1983); *In re Rights to the Use of the Gila River* (*Gila I*), 171 Ariz. 230, 232–33, 830 P.2d 442, 444–45 (1992); *Superior Court*, 144 Ariz. at 269–71, 697 P.2d at 662–64; John E. Thorson et al., *Dividing Western Waters: A Century of Adjudicating Rivers and Streams, Part II*, 9 U. Denv. Water L. Rev. 299 (2006) (providing comprehensive history of western water adjudications); and Joseph M. Feller, *The Adjudication That Ate Arizona Water Law*, 49 Ariz. L. Rev. 405, 417–22 (2007) (reviewing litigation within Gila River adjudication and Silver Creek contest within Little Colorado adjudication). The superior court also provides information on the adjudications at http://www.superiorcourt.maricopa.gov/ SuperiorCourt/GeneralStreamAdjudication.

[2] For clarity, we refer to the State's motions in the two cases in the singular.

8

motion and granted the other claimants' cross-motions on that ground.

¶11    The State sought interlocutory review.  We granted review on this issue of statewide importance to determine whether Congress impliedly reserved water rights on public land granted in trust to the state.  We have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and the Special Procedural Orders for Interlocutory Appeals and Certifications.[3]

### III.  DISCUSSION

### A.    Standard of review

¶12    Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Ariz. R. Civ. P. 56(c).  On appeal, we view the evidence and reasonable inferences therefrom in the light most favorable to the party opposing the motion. *Andrews v. Blake*, 205 Ariz. 236, 240 ¶ 12, 69 P.3d 7, 11 (2003). We review the superior court's summary judgment rulings de novo. *In re the Gen. Adjudication of All Rights to Use Water in the Gila River Sys. & Source* (*Gila VIII*), 223 Ariz. 362, 367 ¶ 6,

---

[3]    Special Order (Sept. 26, 1989) (Gila River adjudication); Special Order (June 1, 1994) (Little Colorado adjudication); Order Clarifying the Special Order Filed June 1, 1994 (Mar. 6, 2000); *see also Gila I*, 171 Ariz. at 233 n.2, 830 P.2d at 445 n.2.

224 P.3d 178, 183 (2010).

**B.   Applicable rule of construction**

¶13      To determine whether the federal reserved water rights doctrine applies, we must first construe the federal legislation granting trust land to Arizona.  The State argues that the superior court erred in narrowly construing the Organic Act and Enabling Act grants.  We disagree.  Federal property grants generally should be interpreted narrowly because "nothing passes by mere implication."  *Knoxville Water Co. v. Knoxville*, 200 U.S. 22, 33–34 (1906); *cf. Kadish v. Ariz. State Land Dep't*, 155 Ariz. 484, 495, 747 P.2d 1183, 1194 (1987) (recognizing principle of construing "federal land grants in favor of the [granting] government"), *aff'd sub nom. ASARCO Inc. v. Kadish*, 490 U.S. 605 (1989).

¶14      Under a limited exception to that general rule, courts may liberally construe federal legislation "designed to aid the common schools of states."  *Wyoming v. United States*, 255 U.S. 489, 508 (1921).  For purposes of determining whether a land grant includes implied rights, this exception applies only when narrow construction of the grant would result in complete failure of the grant's purpose or render the land worthless. *See Lyon v. Gila River Indian Cmty.*, 626 F.3d 1059, 1072-73 (9th Cir. 2010); *Utah v. Andrus* (*Utah Right-of-Access Case*), 486 F. Supp. 995, 1002 (D. Utah 1979); *cf. Andrus*, 446 U.S. at 520

10

(reversing decision in which lower court liberally construed federal legislation regarding indemnity-in-lieu selection).

**¶15** This case raises no such concerns. As noted above, *supra* ¶ 7, the purpose of State Trust Lands is to produce a fund from sale and use of the lands to support common schools and other public institutions designated by Congress. *Lassen*, 385 U.S. at 463; *Lyon*, 626 F.3d at 1073. The State has not argued that, without federal reserved water rights, the State Trust Lands will become worthless or incapable of producing a fund to support their designated beneficiaries. Indeed, State Trust Lands have without such rights produced revenue for a century. *See* ASLD-History, http://www.land.state.az.us/history.htm; *Land Comm'n Report* at 56–64.

**¶16** We agree with other courts that have adopted a rule of narrow construction for federal reserved water rights, recognizing the doctrine's disruptive effect in prior appropriation jurisdictions. *See United States v. City & Cnty. of Denver*, 656 P.2d 1, 26 (Colo. 1982); *New Mexico ex rel. State Eng'r v. Comm'r of Public Lands (New Mexico Commissioner)*, 200 P.3d 86, 95 (N.M. App. 2008) ("[I]n recognition of . . . the potentially substantial and detrimental impact on state rights in fully appropriated stream systems, courts must construe the doctrine of federal reserved water rights narrowly."), *cert. denied*, 129 S. Ct. 2075 (2009).

## C.   Federal reserved water rights doctrine

**¶17**       Generally, water rights must be obtained under state law, even on federal lands. *Cal. Or. Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142, 163-64 (1935). In Arizona, groundwater is regulated by the Arizona Department of Water Resources and governed by the doctrine of reasonable use. A.R.S. § 45-451 *et seq.* (2012). The right to use surface water and sub-flow is governed by the doctrine of prior appropriation, §§ 45-141, -251(7), meaning the first to divert water and put it to beneficial use has priority against later diverters, § 45-151. *See* Ariz. Const. art. 17; *In re the Gen. Adjudication of All Rights to Use Water in the Gila River Sys. & Source* (*Gila IV*), 198 Ariz. 330, 334 ¶¶ 3-5, 9 P.3d 1069, 1073 (2000).

**¶18**       Under certain circumstances, however, the federal government can reserve water rights on its lands, and those rights have priority by operation of federal law. *In re the Gen. Adjudication of All Rights to Use Water in the Gila River Sys. & Source* (*Gila III*), 195 Ariz. 411, 416-17 ¶¶ 13-14, 423 ¶ 43, 989 P.2d 739, 744-45, 751 (1999); *N.M. Comm'r*, 200 P.3d at 94 (citing *Navajo Dev. Co. v. Sanderson*, 655 P.2d 1374, 1379-80 (Colo. 1982)). Federal reserved water right holders can claim a priority date based on the establishment of a federal reservation regardless of whether the claimed water was actually put to use on that date. *N.M. Comm'r*, 200 P.3d at 94 (citing

*United States v. Jesse*, 744 P.2d 491, 493–94 (Colo. 1987)). "[T]he quantity of a federal reserved water right is not determined by the amount of water put to beneficial use; rather, it is determined by the amount of water necessary to carry out the primary purpose of the reservation." *Id.*

¶19 The United States Supreme Court first recognized the doctrine of reserved water rights in *Winters v. United States*, concluding that Congress had impliedly reserved rights to Milk River waters for the Fort Belknap Indian Reservation because those water rights were necessary to sustain the reservation community. 207 U.S. 564, 576–77 (1908). Reserved water rights have since been recognized for non-Indian reservations as well. *See, e.g., United States v. New Mexico*, 438 U.S. 696, 718 (1978) (national forest); *Cappaert v. United States*, 426 U.S. 128, 138 (1976) (national monument); *Arizona v. California*, 373 U.S. 546, 601 (1963) (national recreation areas and wildlife refuges), *abrogated on other grounds by California v. United States*, 438 U.S. 645, 674 (1978).

¶20 The Supreme Court further defined the parameters of the reserved water rights doctrine in *Cappaert*, stating that "when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose," it impliedly reserves appurtenant water "to the extent needed to accomplish the purpose of the reservation." 426 U.S. at 138. In *New*

*Mexico*, the Supreme Court clarified that federal reserved water rights do not extend to a reservation's secondary purposes. 438 U.S. at 702.

**¶21** To determine whether the federal government impliedly reserved water rights, the superior court must

> [1] examine the documents reserving the land from the public domain and the underlying legislation authorizing the reservation; [2] determine the precise federal purposes to be served by such legislation; [3] determine whether water is essential for the primary purposes of the reservation; and finally [4] determine the precise quantity of water — the minimal need as set forth in *Cappaert* and *New Mexico* — required for such purposes.

*In re the Gen. Adjudication of All Rights to Use Water in the Gila River Sys. & Source* (*Gila V*), 201 Ariz. 307, 313 ¶ 14, 35 P.3d 68, 74 (2001) (quoting *Montana ex rel. Greely v. Confederated Salish & Kootenai Tribes*, 712 P.2d 754, 767 (Mont. 1985)); *see New Mexico*, 438 U.S. at 702, 715–17; *Cappaert*, 426 U.S. at 141. This analysis requires review of the pertinent documents to determine whether the land in question was withdrawn from the public domain and reserved for a federal purpose, and, if so, whether Congress intended to reserve appurtenant, unappropriated water for that purpose. *See Cappaert*, 426 U.S. at 138–39.

## D. Withdrawal and reservation for a federal purpose

**¶22** The State argues that the lands Congress granted in trust to the states for institutional purposes fall into a

special category of federal reservation. Under the State's theory, Congress reserved the trust land for the federal purpose of supporting specified public institutions and provided for withdrawal of those lands at the time of survey or, for bulk-grant and indemnity-in-lieu selections, when approved by the Secretary.

¶23     In *New Mexico Commissioner*, the New Mexico Court of Appeals addressed whether Congress had impliedly reserved federal water rights for New Mexico's trust lands. 200 P.3d at 95–98. That court concluded that the relevant language in our states' common Organic and Enabling Acts "did not sufficiently withdraw or reserve lands to create implied federal reserved water rights" and, therefore, did not satisfy "the threshold requirements of demonstrating the existence" of such rights. *Id.* at 97. Although the sections of the Enabling Act providing for Arizona's and New Mexico's land grants are distinct, the language and context of the separate sections are substantially similar for purposes of analyzing the State's reserved water right claim here. *Compare* §§ 6–12, 36 Stat. at 561–65 (New Mexico), *with* §§ 24–30, 36 Stat. at 572–76 (Arizona). We agree with the reasoning and conclusion in *New Mexico Commissioner*.

¶24     The Enabling Act provides:

> [I]n addition to sections sixteen and thirty-six, heretofore *reserved* for the Territory of Arizona, sections two and thirty-two in every township . . .

15

> not otherwise appropriated at the date of the passage of this Act are hereby *granted* to the State for the support of common schools.

§ 24, 36 Stat. at 572 (emphases added) (carrying forward the grants of the Organic Act, § 15, 9 Stat. at 452, which also "reserved" sections sixteen and thirty-six). The term "withdraw" does not appear in any form within the Enabling Act, though it was used in the 1881 bulk grant to support universities, 21 Stat. 326, *see supra* ¶ 3, and that grant was incorporated in the Enabling Act, § 24, 36 Stat. at 572.

**¶25** That Congress uses the word "withdraw" or "reserve" in a statute granting land does not necessarily mean that the land is withdrawn or reserved for purposes of public land law. *S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425 F.3d 735, 784–85 (10th Cir. 2005); *N.M. Comm'r*, 200 P.3d at 96; 2 Charles F. Wheatley, Jr., *Study of Withdrawals and Reservations of Public Domain Lands* App. A-20 (Pub. Land Law Review Comm'n 1969)[4] [hereinafter *Wheatley Report*] ("Mere use of the terms 'withdrawal' and 'reservation' in a statute is not always indicative that the subject lands are to be segregated from the public domain in the usual sense of a 'reservation.' The intent

---

[4] The Public Land Law Review Commission was established in 1964 to review the nation's public land laws, rules, and regulations, and to make public land policy recommendations. Act of Sept. 19, 1964, Pub. L. No. 88-606, 78 Stat. 982. The Commission ceased operation on December 31, 1970. Act of Dec. 18, 1967, Pub. L. No. 90-213, 81 Stat. 660.

of Congress may be quite different.").

¶26     Withdrawal is the "removal or segregation of the land from the operation of the general land laws as the initial step in the dedication of the lands to the predetermined purpose." *Wheatley Report* at App. A-1 to -2.  Statutes that give a state the right to obtain land by selection, including indemnity-in-lieu selection, "should be distinguished from a withdrawal or reservation" because segregation by selection is designed to "protect[] the rights of claimants . . . while the withdrawal statutes are designed to retain the lands and preclude disposal."  *Wheatley Report* at App. A-21 to -22.  This distinction corresponds with the Supreme Court's suggestion that withdrawn land may not be conveyed out of federal ownership. *Arizona*, 373 U.S. at 598 ("We have no doubt about the power of the United States under [the Constitution] to reserve water rights for *its* reservations and *its* property." (emphases added)).    It also corresponds with the Ninth Circuit's suggestion that withdrawal restrains alienation of the land. *Winters v. United States*, 143 F. 740, 748 (9th Cir. 1906) ("[W]hen the lands of the government have been legally appropriated or reserved for any purpose, they become severed from the public lands, and . . . *no subsequent law or sale should be construed to embrace or operate upon them*." (emphasis added)), *aff'd*, 207 U.S. 564 (1908); *see also S. Utah Wilderness*

17

*Alliance*, 425 F.3d at 784 ("'[A] reservation is a tract of land . . . which is by public authority withdrawn from sale or settlement.'") (quoting Black's Law Dictionary 1031 (1st ed. 1891)); 63C Am. Jur. 2d *Public Lands* § 31 (updated August 2012) ("Public land is withdrawn when the government withholds an area of federal land from . . . sale.").

¶27     Before the survey of Arizona's lands, no federal legislation withdrew State Trust Lands from the public domain because those lands had not yet been identified or selected, and they were still available for disposition under homestead, mineral, and other public land laws. *See N.M. Comm'r*, 200 P.3d at 96; *Land Comm'n Report* at 67. The State Trust Lands also were not withdrawn after the Secretary approved the surveys or bulk-grant selections because, at that point, the lands were owned by the state or were subject to a claim by the Territory that would vest upon statehood. *Andrus*, 446 U.S. at 523 (recognizing that title to sections vested in states upon survey's approval); *Gonzales v. French*, 164 U.S. 338, 344 (1896) (recognizing that, before statehood, territories could attach a claim). Additionally, the Enabling Act authorized the state to sell the Trust Land, in whole or in part, "to the highest and best bidder at a public auction." § 28, 36 Stat. at 574.

¶28     Thus, after approval of a survey and selections, State Trust Lands were neither owned by the federal government nor

18

withheld from disposition. *See Kelly v. Allen*, 49 F.2d 876, 878 (9th Cir. 1931) ("[Arizona] is not holding [granted] land as an instrumentality of the United States, but in its own right . . . for the schools of the state."). No withdrawal occurred with respect to State Trust Lands.

¶29 Nor were those lands reserved for a federal purpose. A reservation dedicates land to a specific public use. *S. Utah Wilderness Alliance*, 425 F.3d at 785; Black's Law Dictionary 1031 (1st ed. 1891). That use — the reservation's purpose — must be federal for the federal reserved water rights doctrine to apply. *Cappaert*, 426 U.S. at 138.

¶30 The State argues that the Trust Lands were granted to fund congressionally identified institutions, and they therefore were reserved for a federal purpose, shown by the fact that Congress established a trust with federal enforcement power. *See Lassen*, 385 U.S. at 461–63 (providing that the purpose of land grants was to produce funds to support public institutions and noting that the federal government may enforce the grants' terms); *Kadish*, 155 Ariz. at 487, 747 P.2d at 1186 (providing that the state is trustee of federally granted common school trust land); Enabling Act, § 28, 36 Stat. at 5775 (authorizing the federal government to enforce trust requirements). We are not persuaded.

¶31 Support of the common schools and other specified

19

institutions undoubtedly serves the public interest. It is not, however, a federal purpose. *Cooper v. Roberts*, 59 U.S. (18 How.) 173, 181–82 (1855) ("The trusts created by [common school grants] relate to a subject certainly of universal interest, but of municipal concern."); *N.M. Comm'r*, 200 P.3d at 97 ("Although we do not deny that the support of common schools is a matter of national interest, we cannot conclude that it is also a federal purpose in the context of the implied federal water rights doctrine."); *cf. United States v. Lopez*, 514 U.S. 549, 564 (1995) (recognizing states' power to regulate education); *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 (1973) (recognizing states' power to regulate state prisons); *Holden v. Hardy*, 169 U.S. 366, 395 (1898) (recognizing states' power to regulate insane asylums, hospitals, and schools for the blind).

¶32 Although the Enabling Act imposes federally enforceable trust obligations on the state, this retained oversight does not authorize the federal government to make policy decisions on how the beneficiary institutions are administered. Indeed, "the schools, colleges, and universities provided for in this Act shall forever remain under the exclusive control of [Arizona]." Enabling Act, § 26, 36 Stat. at 573–74.

¶33 Nor does the retained oversight indicate the federal government's continued ownership of the trust lands or its

20

authority to make policy decisions on how the lands are used. *See N.M. Comm'r*, 200 P.3d at 98 (rejecting unsupported proposition "that by retaining oversight or enforcement power over a state's disposition of its trust lands, the federal government also retains the title to the land" as needed to reserve federal water rights); *Campana v. Ariz. State Land Dep't*, 176 Ariz. 288, 291, 860 P.2d 1341, 1344 (1993) (recognizing that the state has "great discretion concerning the disposition of trust lands and has authority to devise detailed plans for the sale, lease, and use of state land"). The Enabling Act provides only a limited federal power to intercede in the event State Trust Lands are abused. *See* S. Rep. No. 61–454 at 19 (1910) ("There is nothing . . . especially radical in [the Enabling Act's enforcement provision], since at the most it merely serves to remove any doubt concerning the right and power of the Executive to take action for the enforcement . . . whenever a serious violation occurs.").

**¶34**     Under a narrow exception to the state's autonomy regarding use of State Trust Land, when a section-in-place grant is located in a national forest reserve, the "granted sections shall be administered as a part of [the] forest," and the federal treasury will appropriate a proportionate share of the gross proceeds of the national forests within Arizona. Enabling Act, § 24, 36 Stat. at 573; *id.* § 28, 36 Stat. at 574. That

21

exception highlights that when the purpose of non-Indian reserved land is federal, the United States government retains control over the reservation's management. *Cf. Kelly*, 49 F.2d at 878. Again, that is not the case with respect to State Trust Lands.

**¶35** Finally, we note that Congress knew how to reserve land for a federal purpose and effectively did so in the Enabling Act when it excluded from selection by the state any lands valuable for providing water power:

> There is hereby *reserved to the United States* and excepted from the operation of any and all grants made or confirmed by this Act to said proposed State all land actually or prospectively valuable for the development of water powers . . . and *no lands so reserved and excepted shall be subject to any disposition whatsoever.*

§ 28, 36 Stat. at 575 (emphases added); *see United States v. Ervien*, 246 F. 277, 278 (8th Cir. 1917), *aff'd*, 251 U.S. 41 (1919). That provision preserved the land for use by the federal government and precluded disposition, unlike the relevant provisions here, which conveyed land to the state and allowed future sales and leases. *See* Enabling Act, §§ 24–28, 36 Stat. at 572–74; *supra* ¶¶ 27–28. The water power provision also concerned unique land, while the relevant provisions here concerned random and uncertain lands. *See id.* § 29, 36 Stat. at 575 (providing that bulk-grant and in-lieu selections must be from "unreserved, unappropriated, and nonmineral public lands");

22

*Andrus*, 446 U.S. at 523 (discussing section-in-place grants as "random cross section[s] of the public land"). Thus, if Congress had wanted to withdraw and reserve for a federal purpose the lands it granted to the state, it could have done so. *See N.M. Comm'r*, 200 P.3d at 97.

¶36 For the foregoing reasons, we conclude that the State Trust Lands were not withdrawn and reserved for a federal purpose. Thus, these lands cannot include federal reserved water rights.

**E.   Congressional intent**

¶37 Even had the State Trust Lands been withdrawn and reserved, no evidence suggests that Congress intended to reserve water rights on those lands. The State contends that the federal government's relationship to the states is akin to its relationship to the Indian tribes and posits that this relationship compels a finding that Congress intended to reserve water for State Trust Land development. We disagree. Unlike reservations for the Indian tribes, land grants to the states are not the product of negotiated agreements or treaties. *See Winters*, 207 U.S. at 575–76. Nor does the State cite authority for resolving any ambiguities in state land grants "from the standpoint of" the states. *See id.* at 576; *cf. United States v. Winans*, 198 U.S. 371, 381 (1905) (indicating that a "treaty was not a grant of rights to the Indians, but a grant of right from

23

them").

¶38      The State also contends that Congress intended to reserve water rights because it knew of the region's aridity and the need for water to make productive use of the land.  To support this contention, the State quotes Senator Daniel Webster's observation that throughout the region, "there is one fatal want of water."  Cong. Globe, 31st Cong., 1st Sess. 860 (1850).  But Senator Webster was speaking about Texas boundaries as he advocated for establishing a territorial border to prevent Texas from claiming land that could help the New Mexico Territory secure the population needed to achieve statehood. *Id.*  Notably, the goal of increasing the Territory's population would also have been supported by ensuring that the region's scarce water supply was obtainable by settlers rather than reserved.

¶39      To enhance the value of its land grant to Arizona, the federal government increased the number of school section-in-place grants from two to four sections per township. *See* Enabling Act, § 24, 36 Stat. at 572; *N.M. Comm'r*, 200 P.3d at 98–99; *Lassen*, 385 U.S. at 463 n.7; *cf.* H.R. Rep. No. 52-737, at 10 (1892) (providing, in an unenacted bill preceding the Enabling Act, that granting Arizona four sections per township would not "more than equal in value the land aid Congress has given the other States" that received fewer sections).  Thus, we

24

conclude that Congress intended to compensate for the relatively low value of land granted to Arizona by augmenting the amount of land granted, not by reserving federal water rights for those lands. *See N.M. Comm'r*, 200 P.3d at 98–99.

## IV.  CONCLUSION

**¶40**     For the reasons stated above, we find no withdrawal, no reservation for a federal purpose, and no congressional intent to reserve water rights for the State Trust Lands.[5]  We therefore affirm the judgment of the superior court.


_____
                 A. John Pelander, Justice


CONCURRING:


_____
Rebecca White Berch, Chief Justice


_____
Robert M. Brutinel, Justice

_____

[5]    Our conclusion that federal reserved water rights do not exist for State Trust Lands is independent of, and thus not based on, the 1877 Desert Land Act to which the special master, superior court, and several parties refer.  The superior court's findings and conclusions regarding that Act, however, are consistent with this opinion. *See Ickes v. Fox*, 300 U.S. 82, 95 (1937) ("[B]y the Desert Land Act of 1877 (c. 107, 19 Stat. 377), if not before, Congress had severed the land and waters constituting the public domain and established the rule that for the future the lands should be patented separately.  Acquisition of the government title to a parcel of land was not to carry with it a water right.").

_____
Lawrence F. Winthrop, Judge[*]

_____

[*]     Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable Lawrence F. Winthrop, Chief Judge of the Court of Appeals, Division One, was designated to sit in this matter.